# STATE v. MARK WENDLER.

252 N. W. 2d 266.

March 25, 1977—No. 45689.

*C. Paul Jones,* State Public Defender, and *Roger H. Hippert,* Assistant State Public Defender, for appellant.

*Warren Spannaus,* Attorney General, *Richard G. Mark,* Assistant Solicitor General, *Richard B. Allyn,* Assistant Attorney General, *Gary Hansen,* Special Assistant Attorney General, and *Robert J. Berens,* County Attorney, for respondent.

Heard before Rogosheske, Kelly, and Scott, JJ., and considered and decided by the court en banc.

SCOTT, JUSTICE.

This is an appeal by Mark Wendler from a judgment of conviction of murder in the second degree. We affirm.

At the time of the incident involved, defendant was 19 years old, living in Mankato and, because of a disability in his hip caused by a motor vehicle accident, being assisted by the Mankato Rehabilitation Center, which placed him with a Mankato nursing home as an orderly. On May 3, 1974, defendant left Man-

kato to spend the weekend with his family on their farm near Comfrey in Brown County. On the following day, Saturday, he spent some time target shooting with a .22-caliber rifle and a .22-caliber target pistol. Defendant's sister, Marcia, aged 14, accompanied him and asked to shoot the pistol. Because their mother forbade this, they decided to go some distance from the farmhouse. As they walked through a grove, defendant raised the pistol with his left hand and, from a distance of about 15 feet, killed Marcia instantaneously with one shot in the back of the head. Defendant then put the pistol in his right hand and shot himself in the head. District Court Judge Noah Rosenbloom found that defendant intentionally shot and killed his sister and that he was legally sane at the time of the act. A postconviction hearing was held before District Court Judge Miles Zimmerman, who found that there was a substantial basis for a finding of guilty.

The two issues stated by defendant in his brief read as follows:

"I. Did [defendant] prove that he was insane at the time of offense charged by a preponderance of the evidence?

"The trial court held: In the negative.

"II. Was [defendant] denied his constitutional right to confront the witnesses against him by the prosecution's elicitation of hearsay testimony from [defendant's] psychiatrist?

"The trial court did not rule."

■ The standard for acquittal by reason of insanity is stated in Minn. St. 611.026:

"No person shall be tried, sentenced, or punished for any crime while mentally ill or mentally deficient so as to be incapable of understanding the proceedings or making a defense; *but he shall not be excused from criminal liability except upon proof that at the time of committing the alleged criminal act he was laboring under such a defect of reason, from one of these causes, as not to know the nature of his act, or that it was wrong.*" (Italics supplied).

Defendant claims that in State v. Rawland, 294 Minn. 17, 199

N. W. 2d 774 (1972), this court effected a more liberal construction of Minn. St. 611.026. That case does not support such an assertion. We said in Rawland:

"(b)  In determining whether or not a defendant has met the burden imposed on him by statute to prove absence of guilt because of insanity, the factfinder may give credence to competent evidence that relates to cognition, volition, and capacity to control behavior. The basic question of fact remains, however, whether in the light of this burden and this evidence the defendant was laboring under such a defect of reason as not to know 'the nature of his act, or that it was wrong.'" 294 Minn. 46, 199 N. W. 2d 790.

The court therefore clearly held that a factfinder may consider any competent evidence that relates to cognition, volition, and capacity to control behavior, but the standard for a legal finding of insanity was not altered. The trial court considered Rawland and found that defendant was cognitive of his actions, acted volitionally, and had the capacity to control his behavior.

Defendant here did not testify, but the court had the benefit of an examination by Sheriff Ervin Weinkauf and Deputy Sheriff Harry Thorau of Brown County. This interrogation was quite thorough and was instigated by a call from defendant's father to the sheriff indicating that his son wished to speak to the authorities. In this interrogation on May 13, defendant could give absolutely no reason for shooting his sister but said he shot himself because, "When I seen what I done to my sister I just couldn't face it." He also indicated that he had aimed a gun in the past at his other sister but did not fire and had thought of shooting his mother once, but that neither of them were aware of this. Deputy Thorau asked the defendant:

"Q.  Can you somehow possibly, Mark, explain as to what could have went through your mind? I mean what possibly could have prompted you or caused you to do that? Did you see her as she was standing there possibly signifying something else to you? What could have possibly gone through your mind?

"A. It's kind of hard to describe. She just—she just turned around and was just standing there and all of a sudden I just pulled the trigger for no reason."

And concluded the interrogation as follows:

"Q. I see. In other words, Mark, to wind this up, it is with the full knowledge now as you are here and you are fully aware and you can recall as to what happened and you are telling me now that you raised your left hand, pulled the trigger point blank at Marcia's neck and the cause of this was that she died?

"A. Yes.

"Q. And this shot was not an accident, this was a deliberate act of shooting, is this what you are saying, Mark?

"A. I guess that's what you'd call it, yah."

Judge Zimmerman in his memorandum and findings following the postconviction hearing noted:

"* * * The trial court also could consider the confession or recorded statement taken from [defendant] by the sheriff's department. It could also consider his remarks and acts immediately following the crime. It could note the absence of testimony demonstrating that he was anything but a peaceable man prior to the murder and that there was lacking a definite history of mental illness of the type found afterwards. The history of mental illness in the Rawland case was extensive. It could also find uncertainty and ambivalence in Dr. Eggert's testimony."

Dr. Delmer C. Eggert, the defense psychiatrist, indicated that he examined defendant on June 13, 1974, with the benefit of the Immanuel-St. Joseph Hospital records and prior examinations made by Dr. Benjamin Lund, a psychiatrist, and Dr. Robert Long, a certified consulting psychologist, since the shooting. From this 2-hour interview and the other psychiatric reports, Dr. Eggert concluded that defendant was schizophrenic, and that he was mentally ill and did not know that his act was wrong.

The trial judge concluded:

"There is no doubt but what defendant knew the weapon in his hand was a gun. The act [of] firing at his sister was intended to inflict death upon her. It was undertaken in the belief and expectation death would result and it was deliberately aimed at her head at virtually pointblank range where fatal outcome was most likely. There was no illusion about the target; Defendant's intended victim was Marcia Wendler. The setting, then, of this homicide was accurately perceived by the defendant."

The postconviction judge stated: "The Court at the trial level heard all the testimony and itself interrogated Dr. Eggert to some length." He further stated: "The issue of insanity was thoroughly litigated at the trial, [and] there is a substantial basis for the determination made and there is no impediment to it being brought before the Supreme Court for review." It is therefore felt that the trial court was correct in concluding:

"(2) Though afflicted with a mental illness of a schizophrenic type at the time of his act, defendant knew the nature of his act and that it was wrong at the time he caused Marcia Wendler's death so that he is not relieved of criminal liability for his act by his mental illness."

This conforms with State v. Bott, 310 Minn. 331, 246 N. W. 2d 48 (1976), wherein the defense psychiatrist indicated that the defendant believed someone had implanted wires in his brain so as to control him by radio transmission and that he suffered from paranoid psychosis. This court stated:

"There is little doubt from that evidence that defendant was suffering from mental illness, but under Minn. St. 611.026 he may not be excused from criminal liability unless that mental illness caused such a defect of reason that at the time of the incident defendant did not know the nature of his act or that it was wrong." 310 Minn. 334, 246 N. W. 2d 51.

■ The second issue raised by defendant—that he was denied his right of confrontation because the prosecution elicited hearsay testimony from defendant's psychiatrist—seems to be with-

out substance upon consideration of the entire record. The record discloses that upon arraignment the attorney for defendant, in referring to his request to have Dr. Eggert appointed, stated:

"He has indicated to me that he would like to have an authorization so that he can obtain all of this information, all of the clinical, the laboratory data, and my understanding is that it would then be a fairly uncomplicated procedure for him to make an examination and to do a report, having available to him all of that."

This was a reference to the discussion concerning data from the Sioux Trails Mental Health Center, and from Dr. Lund and Dr. Long.

Then, when Dr. Eggert took the stand at trial and upon direct examination by defense counsel, he said:

"* * * There was some correspondence which had arrived earlier and this was from the offices of Dr. Lund and from Sioux Trails Mental Health Center and portions of his hospital record from Immanuel-St. Joseph's Hospital. This was a hospitalization that had occurred shortly before I saw him."

He later indicated that he also had the psychological report submitted to him by Dr. Long. It is therefore difficult to understand how, under these circumstances, cross-examination regarding that upon which his opinion was based, including the difference between his conclusions and those of Dr. Lund, violated defendant's constitutional rights.

Affirmed.

MR. CHIEF JUSTICE SHERAN took no part in the consideration or decision of this case.