**STATE of Minnesota, Respondent,**

v.

**Anthony Kenneth MALLEY, Appellant.**

**No. 46659.**

Supreme Court of Minnesota.

July 27, 1979.

Thuet & Collins, and Robert Collins, South St. Paul, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, John O. Sonsteng, County Atty., Richard Hopper and Kathleen Stolar, Asst. County Attys., Dakota County, Hastings, for respondent.

1. Minn.St. 609.185 provides in part: "Whoever does * * * the following is guilty of murder in the first degree and shall be sentenced to imprisonment for life:

"(1) Causes the death of a human being with premeditation and with intent to effect the death of such person or of another * * *."

Heard before KELLY, YETKA, and SCOTT, JJ., and considered and decided by the court en banc.

KELLY, Justice.

Defendant appeals from his conviction for first-degree murder entered in Hennepin County District Court. There are only two issues presented to this court:

(1) Was defendant so mentally ill or deficient at the time of committing the murder that he did not know the nature of his act or that it was wrong? Minn.St. 611.026.

(2) Did the State of Minnesota prove beyond a reasonable doubt that defendant caused the death of his wife with premeditation and with the intent to effect her death so as to sustain the jury verdict of murder in the first degree? Minn.St. 609.-185.[1] We affirm.

The basic facts are undisputed; the controversy focuses instead on the inference from those facts to defendant's mental state at the time he killed his wife. At that time, defendant was 62 and his wife 63, and they had been married some 33 years. They did little socializing and little is known about their marriage. His wife was heavily dependent on defendant, especially so in the 20 years since her mother's death, when she required that defendant cook all her meals as she feared food poisoning.

Defendant began work for the income tax division of the Revenue Department of the State of Minnesota in 1953. He was by all testimony a hard and conscientious worker, a gentle conservative man who rarely, if ever, displayed anger. In 1973 computers were introduced into the department, an innovation that caused stress generally to the employees but particularly to defendant, who had a limited educational background and who supervised approximately 50 persons in the accounting section. In March or April 1975, his supervisor criti-

Section 609.18 defines "premeditation" to mean "to consider, plan or prepare for, or to determine to commit, the act referred to prior to its commission."

cized defendant for failing to delegate work and for lacking managerial ability. Defendant agreed with the appraisal and offered to resign. Instead, a lateral transfer effective May 19, 1975, to the sales tax division was arranged with defendant's consent. During this period, defendant became more serious and withdrawn, lost weight, and expressed concern about his ability to perform his new assignment. He consulted a Christian Science practitioner to help him during the job transition.

As part of his new duties, defendant had to become acquainted with the sales tax regulations. He experienced some difficulty in learning the regulations and also realized that his wife had failed to collect a tax on porch sales of knickknacks she had crafted. He discussed this lapse with his supervisor who attempted to assure him the violation was minor but defendant remained bothered by the situation. A meeting was then arranged with the director of the sales tax division to reassure defendant. On June 4, 1975, the director told defendant the amount of the sales tax liability would not warrant the cost of processing a return and that he should forget about it. When defendant refused to dismiss the matter because in his eyes the tax collector was violating the tax laws and stated he felt that the department would prosecute him, the director suggested he seek medical help. Defendant reluctantly agreed, foreseeing objections of his wife, who was a Christian Scientist.

Defendant did not return to work after the day of the meeting. He utilized excess leave he had accumulated and called his supervisor to inform him of his absence. Defendant continued to express concern about the sales tax violations in these telephone conversations and also stated on June 12 to a fellow employee: "I am just having severe problems right now. * * * I don't know how much longer I can cope." The evening of June 12, however, defendant and his wife visited a neighbor and acted entirely normally. On June 5, defendant did see a physician, who concluded that defendant was depressed and recommended further treatment. Defendant returned for additional tests on June 10 but not thereafter.

The morning of June 13, 1975, defendant awoke at 5 o'clock, his usual hour. He dressed, went downstairs and got a shingle hammer, returned upstairs, and as his wife lay sleeping, repeatedly struck her skull with the hammer, causing her death. The victim also suffered other abrasions and lacerations, several broken ribs, and a thin line of discoloration around her neck.[2] Defendant called the police at 6:27 a. m. and informed them that something had happened to his wife and that it was his fault. Earlier, he had called his Christian Scientist counselor so that she would not learn of the incident through the news media. The officer who went to the scene found defendant sitting calmly, dressed in a shirt and tie, a sport coat draped nearby. Upon arriving at jail, defendant told a deputy, "I guess I should feel some remorse, but I feel nothing." Defendant then made a formal statement, confessing to the murder.

That afternoon fellow employees visited defendant in jail, where he told them of increasing pressures and that in recent days the radio, newspaper, and television, along with persons in the grocery store, had seemed to point to him and his wife as the subjects of an investigation. But, he said he now realized his fears were unjustified. He told defense psychologists that he had considered using the shingle hammer sometime earlier, and that he could not have killed his wife had she been awake. On June 16, he told two co-workers he had done a stupid thing.

■ Defendant was charged with first-degree murder. At trial he endeavored to prove that he was legally insane at the time

---

2. Acid phosphatase, an element of seminal fluid, was found in the vagina, rectum, and mouth of defendant's wife. The pathologist could not determine whether the fluid was present before or after Mrs. Malley's death, but that a strong possibility existed that the fluid in her mouth was deposited after death. Defendant and his wife apparently never consummated their marriage, and defendant's sexual frustration may have been a factor in the murder.

of his wife's death.[3] He advanced three expert witnesses in support of his position; the state rebutted with an equal number.

Mr. Don Anderson, a psychologist who had worked at various state institutions, was defendant's first expert witness. He administered a number of tests to defendant and diagnosed his condition at the time of the incident as an obsessive compulsive schizoid personality with involutional paranoid depression psychosis. In Mr. Anderson's opinion, this condition permitted defendant to realize the nature of the act, i. e., that he would effect his wife's death by striking her with the hammer, but not that the act was wrong. He reconstructed defendant's thought processes at the time as follows:

" * * * [H]e saw his wife as someone who would suffer the agonies of hell if he were taken from her, or if, as he also thought was possible, that she might also be incarcerated as a result of this tax problem.

"So, he was faced with a very difficult problem, a woman by virtue of her own personality problems, to say the least, was incapable of living alone, and yet with the prospects that he would be snatched from her, or even worse, that would mean he would be confined. Here is a woman, from what Mr. Malley says, has been unable to eat, has been really unable to care for herself, has various fears that keep her, not totally confined to the house by any means, but still somewhat apart from society.

\* \* \* \* \* \*

"Incredibly enough, he was attempting to protect her in a sense."

Dr. Carl Schwartz, a psychologist, concurred in this analysis, as did Dr. A. William Diessner, a psychiatrist and defendant's third expert witness, who also found some evidence of brain damage.

None of the state's witnesses was able to interview defendant, as the Rules of Criminal Procedure now permit, Rule 20.02, so each relied instead on the tests administered and the testimony given by defendant's witnesses. Dr. Dennis Philander, a psychologist, felt that defendant knew both the nature of his act and that it was wrong. Dr. Philander, however, expressed some reservation as to the latter opinion, which was based on the coherence of defendant's statements and conduct before and after the incident and his conclusion that the delusions defendant suffered did not dominate his thinking. Dr. Philander's reservation concerned the adequacy of the information available to him regarding defendant's intent and the strength of his delusions, although he felt able to give a general picture of defendant's behavior. Dr. Philander agreed that defendant was mentally ill and concurred very much in that respect in the diagnosis of defendant's witnesses.

Dr. Maria Milillo, a clinical psychologist and the state's second expert witness, could not render an opinion regarding defendant's conduct based on the information available to her.

The state's third witness was Dr. Charles Rymer, a psychiatrist. He testified that defendant knew the nature of his act and that it was wrong based on defendant's statements and conduct and latent feeling of marital frustration, but he did not view defendant as a psychotic because defendant exhibited no long-term delusions.

■ Despite extensive cross-examination of the state's witnesses, the jury found defendant legally sane at the time of his wife's death. Sufficient evidence was adduced to support the verdict. *State v. Hoskins,* 292 Minn. 111, 193 N.W.2d 802 (1972).

---

3.  Minn.St. 611.026 provides the applicable definition of legal insanity: "[A person] shall not be excused from criminal liability except upon proof that at the time of committing the alleged criminal act he was laboring under such a defect of reason, from one of these causes [mental illness or deficiency], as not to know the nature of his act, or that it was wrong." E. g., *State v. Wendler,* 312 Minn. 432, 252 N.W.2d 266 (1977). The burden is on the defendant to prove insanity by a preponderance of the evidence. E. g., *State v. Finn,* 257 Minn. 138, 100 N.W.2d 508 (1960).

■ The second issue is somewhat troublesome. The defendant contends that his mental condition was so diminished that he lacked the capacity to form the elements of premeditation or specific intent essential to a conviction for first-degree murder. He suggests that the conviction should be reduced to second or third-degree murder. However, there was ample evidence to support the jury's verdict concerning premeditation and intent although there is a possibility that the jury might have rendered a verdict of a lesser included offense if an instruction had been given as to lesser included offenses. The defendant waived his right to such an instruction by not requesting it. The defendant thus used an approach as a matter of trial tactics of being found guilty of first-degree murder or of being found not guilty by reason of insanity. There was not such evidence of lesser included offenses as to require the court to give such instructions sua sponte.

In *State v. Jordan,* 272 Minn. 84, 136 N.W.2d 601 (1965), we summarized the principles which should govern the submission of a lesser included offense. A part of that summation was as follows:

"(c) If the evidence adduced at trial would permit a finding of guilty of an included crime, defendant is entitled to appropriate instructions advising the jury of its power to return a verdict of guilty of the lesser offense.

"(d) The right of the defendant to have such instructions given to the jury may be waived (d1) expressly or (d2) implicitly by failure to make proper request for such submission." 272 Minn. 86, 136 N.W.2d 604 (footnotes omitted).

In *State v. Leinweber,* 303 Minn. 414, 228 N.W.2d 120 (1975), we confirmed our position set forth in *Jordan.* We also said this:

" * * * In determining what, if any lesser degrees should be submitted, *the test should be whether the evidence would reasonably support a conviction of the lesser degree and at the same time is such that a finding of not guilty of the greater offense would be justified. Where such is the state of the evidence, it is the duty of the trial court to submit such lesser degrees as it determines the evidence warrants* in order that the jury may properly carry out its deliberations contemplated by §§ 611.02 and 631.14. It follows that in such cases, *unless waived by defendant, it is error not to submit lesser degrees except in those extraordinary cases where the failure to do so is otherwise supported by a proper exercise of the trial court's discretion and no prejudice to defendant results."* 303 Minn. 422, 228 N.W.2d 125. (Italics supplied.)

It is questionable that the trial court had a duty under the above principles to submit any lesser degrees. The evidence in this case might support a conviction of the lesser degree; however, it is highly questionable that a finding of not guilty of the greater offense would be justified.

Despite the absence of a request by defense counsel, the district court did consider charging the jury on lesser included offenses. In a memorandum accompanying its order denying defendant's post-trial motions, the court stated:

"While there was no request for an instruction on lesser and included offenses the Court did consider this not easy to resolve problem prior to instructing the jury in line with the principles set forth in *State v. Jordan* and *State v. Leinweber* and came to the conclusion that under the state of the record a finding of not guilty of murder in the first degree would not be justified unless it be on the grounds of mental illness."

In any event, the submission of lesser included offenses was implicitly waived by the defendant under the principles enunciated in *Jordan* and approved in *Leinweber.*

■ The sentence here is disparate with that to be given to a cold-blooded killer for hire. This case is an appropriate one for consideration of commutation of sentence by the Pardon Board.

Affirmed.

YETKA, Justice (dissenting).

I dissent from the majority opinion in this case because in my opinion the facts do not

support appellant's conviction. While there is no doubt that defendant committed the act of killing his wife, defendant's sanity at the time of the killing is significantly less clear. In my opinion, the evidence cannot reasonably support the jury's finding that defendant was sane when the murder was committed.

Although I do not advocate a departure from the well-established rule that the jury or the trial court sitting without a jury has the duty and the function of fact-finder, I am conscious of the ultimate responsibility of this court to set aside a verdict where, under the evidence contained in the record, the jury could not reasonably find the accused sane. See, *State v. Hoskins,* 292 Minn. 111, 193 N.W.2d 802 (1972), citing the standard set forth in *State v. Thompson,* 273 Minn. 1, 139 N.W.2d 490, certiorari denied, 385 U.S. 817, 87 S.Ct. 39, 17 L.Ed.2d 56 (1966).

Defendant had the burden to prove insanity only by a preponderance of the evidence. See, *State v. Bott,* 310 Minn. 331, 246 N.W.2d 48 (1976). Defendant sustained that burden. The overwhelming weight of the evidence proved that defendant did know the nature of his act but did not know that it was morally wrong. In *Bott, supra,* we explained that the word "wrong" within the meaning of Minn.St. 611.026 does not refer to a violation of statute but is used in the moral sense. The testimony of the state's two experts, one of whom substantially questioned the accuracy of his own opinion on the issue of wrongfulness, blurred that distinction.

Drs. Rymer and Philander, who did not personally examine the defendant, emphasized the facts that defendant called the police and admitted to the killing as supporting their conclusion that he knew the act was wrong. While this evidence indicates that defendant knew it was legally wrong, other evidence, in particular his lack of remorse, his intent to protect the decedent, and the conclusions of the experts who examined defendant unequivocally compels the finding that he did not know it was morally wrong.

By more than a fair preponderance of the evidence defendant proved, primarily through the defense experts, that he was legally insane. The jury was not bound, of course, to accept the experts' opinions. It acted, however, subject to the standard of reasonableness. If the jury chooses to reject the expert testimony, as it did here, then its decision must be reasonably based on the evidence as a whole. I conclude that it was not.

The non-expert evidence also does not support the jury's verdict. After a marriage of 33 years, which was not sexually consummated, to an unusually dependent woman, and a job of several decades from which he was transferred, he uncharacteristically displayed signs of a serious mental and emotional disturbance to his supervisors and his medical doctor. The killing itself was committed in a strikingly dispassionate manner with a bizarre sexual aftermath, which defendant denies or has forgotten. The act was totally contrary to the nature of the man, who, but for the killing, was an exemplary husband and employee.

This court has set aside the fact-finder's verdict of sanity where the evidence so compels in order to best fulfill the intent of Minn.St. 611.026. See, *State v. Rawland,* 294 Minn. 17, 199 N.W.2d 774 (1972). The instant case requires a similar disposition. The judgment of guilty should be vacated with directions to enter a judgment of not guilty by reason of insanity and for proceedings in the district court for commitment pursuant to Minn.St. 631.19.

OTIS, Justice (dissenting).

I concur in the views expressed by Mr. Justice Yetka. We are here dealing with a "hard and conscientious worker, a gentle, conservative man who rarely, if ever, displayed anger" who became demented in his paranoid conviction that a trivial oversight on the part of his wife would lead to his prosecution.

Where the record discloses behavior as irrational as this, I cannot agree that the defendant is held to the same standard of

responsibility as a "coldblooded killer for hire." In my opinion it is unwarranted and unjust to ignore the extraordinary circumstances which drove this defendant to his act of violence totally out of character for a person of his background.

At the very least the facts require confinement in a medical facility for treatment rather than punishment in a penal institution for a minimum of 17 years when the defendant will be almost 80 years of age.

I would grant a new trial in the interests of justice.

WAHL, Justice (dissenting).

I concur in the dissent of Mr. Justice Yetka.

ROGOSHESKE, Justice (dissenting).

I concur in the views expressed by Mr. Justice Otis.