STATE of Minnesota, Respondent,

v.

Charles LaTOURELLE, Appellant.

No. C9–82–387.

Supreme Court of Minnesota.

Jan. 20, 1984.

C. Paul Jones, State Public Defender, by Mark F. Anderson, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Norman B. Coleman, Jr., Janet Newberg Anderson, Sp. Asst. Attys. Gen., St. Paul, Roger S. Van Heel, Stearns Co. Atty., St. Cloud, for respondent.

YETKA, Justice.

Charles LaTourelle appeals from his conviction on three counts of first-degree murder: one under Minn.Stat. § 609.185(1) (1982) (premeditated murder) and two under Minn.Stat. § 609.185(2) (1982) (felony murder). The two counts of felony murder were based on different sections of the statute defining criminal sexual conduct in the first degree: Minn.Stat. § 609.342(d) (1982) (sexual penetration while armed with a dangerous weapon) and Minn.Stat.

§ 609.342(e) (1982) (sexual penetration resulting in personal injury).

The case was tried to a jury in a bifurcated trial before the Stearns County District Court. The first phase of the trial was on the issue of appellant's guilt; the second was on whether appellant's mental condition absolved him of criminal responsibility under Minn.Stat. § 611.026 (1982). Mr. LaTourelle was sentenced to mandatory life imprisonment on Count II. The court did not enter a sentence on the remaining counts. We affirm the conviction on Count II and vacate the convictions on Counts I and III.

This case arose out of the stabbing death and rape of a female college student at the Newman Center of St. Cloud State University ("the Center") during the early morning hours of October 27, 1980. The defendant, age 25, was an assistant manager of a pizza restaurant located in the lower level of the Center. The victim, Cathy John, age 21, was another assistant manager in the same restaurant. The defendant and the victim were not working together at the time of the murder. Shortly after the killing, Charles LaTourelle called the police and confessed. At trial, Mr. LaTourelle claimed that he was not responsible for the crime because he was suffering from a mental condition which impaired his volition and capacity to control his behavior at the time he committed the murder.

The only expert testimony on the psychiatric issue was given by Dr. Carl Malmquist. Dr. Malmquist testified for the defense. Dr. Malmquist's testimony at trial covered his impressions of Mr. LaTourelle based on 8 hours of observation, an analysis of Mr. LaTourelle's description of the murder, and an opinion on Mr. LaTourelle's ability to know, understand, and control his actions on the night of the murder.

The defendant gave Dr. Malmquist the following history of the night of the murder. The weekend of October 24–26, 1980, was Homecoming at St. Cloud. The defendant worked three shifts over the weekend while others were engaging in revelry,

and this caused him to feel alone and left out. On the night of Sunday, October 26, 1980, Mr. LaTourelle, his roommate, and another fellow drank a few beers and smoked some marijuana, then went to the apartment of two female friends. There, they each drank a few shots of whiskey, and the defendant probably had another beer. The defendant was shy and withdrawn at the women's apartment, as he always was with women. Dr. Malmquist characterized the defendant's behavior as "vicarious participation." That is, even though appellant was intensely shy, lonely, and quiet while with people, being in a crowd made him feel "as if [he could] talk with them, really mingle with people; as if [he was] not so lonely."

When the others were too tired to continue socializing, Mr. LaTourelle went to a number of bars on his own. As he sat in the last bar he visited before going to the Center, Mr. LaTourelle felt lonely and depressed. He told Dr. Malmquist that he remembered thinking that he wanted to speak to a couple of the women who were there, but that he could not "get up the nerve" to do so. At that point, he began to fantasize about asking a woman to dance with him or to have sex with him.

As closing time (12:00 midnight) neared, the defendant began to fantasize specifically about Cathy John. He had occasionally had sexual thoughts about her before, but had never approached her. When the bar closed, Mr. LaTourelle was struggling with himself over whether he should or shouldn't go to the Center and rape Ms. John.

He went to the Center about 12:15 or 12:30 a.m. He sat down on a chair in a deserted reception area and dozed off—an effect of the drug and alcohol consumption. After a few minutes, he awoke and vomited. He told Dr. Malmquist that he felt like leaving then, but stayed because he heard employees leaving. He got up and went downstairs to the pizza area where he heard Ms. John on the telephone. He went to the kitchen, picked up an extension telephone for a minute, and concluded that she

was talking to her boyfriend. Then he got a knife from the kitchen and went to the stage area adjacent to the kitchen. He was still considering raping Ms. John. Eventually he heard her come downstairs, presumably to shut off the lights. Mr. LaTourelle told Dr. Malmquist that he had decided simply to stand there and wait until Ms. John was gone and then leave. He told Dr. Malmquist that he expected her to leave without entering the stage area. However, she came onto the stage to get her coat. She walked across the stage and picked up her coat. When she turned to leave, she saw Mr. LaTourelle standing there with the knife. She said, "Hi, Chuck" and walked hurriedly past him towards the steps. As she passed him, he stabbed her. Mr. LaTourelle told Dr. Malmquist that he did not intend to stab her until the moment she saw him, which caused him to panic. When Mr. LaTourelle believed Ms. John was dead, he pulled off her slacks and underpants and had intercourse with her very quickly.

Appellant told Dr. Malmquist that he then dragged the body out of the building and over a fence and threw it into the Mississippi River. After so disposing of the body, he put Ms. John's slacks, stockings, and underpants in a flour sack, which he also threw into the river. He then returned to the building and cleaned up the knife, the vomit, and some blood. While Mr. LaTourelle was either still outside or cleaning up the blood inside, a baker who worked at the Center came into the building and saw him. Mr. LaTourelle told Dr. Malmquist that he believed the baker would report seeing him after the body was found, thus leading the police to Mr. LaTourelle. Because of this belief, Mr. LaTourelle called the police and confessed to the murder.

Dr. Malmquist believed that appellant's behavior throughout this incident revealed an intense sexual conflict which had been repressed for many years and which caused Mr. LaTourelle to lack the volition and capacity to control his actions at the time of the murder.

Dr. Malmquist testified that the defendant's repressed sexual conflict led to a condition called "Isolated Explosive Disorder," [1] which impaired his ability to resist killing Ms. John. The defendant told Dr. Malmquist about a "rape fantasy" he developed early in his adolescence, which consisted of grabbing a woman, pulling her to the ground, tying her up, and forcing her to have sex. Occasionally, the fantasy involved beating up the woman, but it never included use of a knife or killing the victim. According to Dr. Malmquist, the defendant struggled against actually carrying out this fantasy for many years before the murder. The fantasy plagued him throughout his adolescence and his 4 years of service in the Marines. Coinciding with the fantasy was the desire for a "normal" relationship with a woman and yet a total lack of contact with women. The rape of Ms. John's body after the killing was his first sexual experience with a woman; prior to that time, he had never even hugged or touched a woman.

Dr. Malmquist also testified that the defendant's pattern of alcohol abuse interacted with his long-standing sexual conflict and contributed to his inability to control his behavior on the night of the murder. While in the Marines, Mr. LaTourelle drank to the point of intoxication every night of the week. He usually drank alone. While drinking, Mr. LaTourelle would feel closer to being able to carry out his rape fantasy; however, he emphasized to Dr. Malmquist that he did not drink for the purpose of gathering up the courage to rape a woman. Sometimes when drinking, the defendant would have the rape fantasy and would struggle with himself against carrying out a rape by "talking [him]self out of it." Defendant was following this pattern of drinking and fantasizing about rape on the night of the murder. In Dr. Malmquist's opinion, appellant's sexual conflict was so great that some violent act was inevitable.

Dr. Malmquist concluded that the defendant was suffering from an impairment of his volition and capacity to control his behavior at the time he killed Cathy John, even though he knew cognitively what he was doing and that his actions were wrong. Dr. Malmquist would not give an opinion on the ultimate issue of whether Mr. La Tourelle "knew" the wrongfulness of his act in the legal sense. Prior to the trial, Dr. Malmquist had expressed his opinion on the insanity issue in a letter to Judge Hoffman. The letter stated:

(1) I do not feel that Mr. LaTourelle had a defect of reason; (2) His mental state was not a psychotic one but rather related to a) intoxication, and b) sexual conflicts of a long-standing nature; 3) It is my opinion that he did know the act of stabbing Ms. John as she passed him; (4) It is not my opinion that his cognition was impaired; (5) It is my opinion that his volition was impaired.

Letter from Dr. Carl P. Malmquist to the Honorable Paul G. Hoffman (Oct. 15, 1981).

At the close of the second phase of the trial, defendant's attorney requested a jury instruction that the jury should consider volition, cognition, and capacity to control behavior in deciding the insanity issue. Although the court denied that particular instruction, Judge Hoffman did use the following language: "[E]ven if defendant knew the nature of his act, he must also have understood that his act was wrong and he must have been competent at the time to make the choice to do the act."

The issues raised on appeal are:

1. Whether appellant established by a preponderance of the evidence that

---

**1.** There are four diagnostic criteria for this disorder:

"A. A single, discrete episode in which failure to resist an impulse led to a single, violent, externally directed act that had a catastrophic impact on others.

"B. The degree of aggressivity expressed during the episode was grossly out of proportion to any precipitating psychological stressor.

"C. Before the episode there were no signs of generalized impulsivity or aggressiveness.

"D. Not due to Schizophrenia, Antisocial Personality Disorder, or Conduct Disorder."
Task Force on Nomenclature and Statistics, The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 298 (3d Ed.1980).

he was so mentally ill as to be excused from criminal responsibility;

2. Whether the trial court erred in refusing to instruct the jury that it should consider volition, cognition and capacity to control behavior in determining whether appellant knew the nature of his act and that it was wrong;

3. Whether two of the three first-degree murder convictions should be vacated because there was only one death.

■ 1. Minn.Stat. § 611.026 (1982) establishes the standard for excuse from criminal liability by reason of mental illness:

No person shall be tried, sentenced, or punished for any crime while mentally ill or mentally deficient so as to be incapable of understanding the proceedings or making a defense; but he shall not be excused from criminal liability except upon proof that at the time of committing the alleged criminal act he was laboring under such a defect of reason, from one of these causes, as not to know the nature of his act, or that it was wrong.

The defendant has the burden of satisfying the requirements of section 611.026 by a preponderance of the evidence. *State v. Dodis*, 314 N.W.2d 233, 239 (Minn.1982). The defendant argues that Dr. Malmquist's unrebutted opinion that the defendant's impairment of volition and capacity to control his behavior at the time of the murder satisfies his burden of proving excuse by mental illness. The defendant's argument on volition and capacity is a restatement of the "irresistible impulse" definition of insanity. This court has rejected the "irresistible impulse" definition. *See, State v. Rawland*, 294 Minn. 17, 35–36, 43, 199 N.W.2d 774, 784–85, 789 (1972). Moreover, the definition is based on the premise that a defendant cannot be criminally liable if he lacks the capacity to control his behavior. We specifically rejected the defense of diminished capacity in *State v. Bouwman*, 328 N.W.2d 703, 706 (Minn.1982).

In *Rawland*, we considered the constitutionality of the standard stated in Minn. Stat. § 611.026. In order to avoid a finding of unconstitutionality, we ruled that a jury could consider evidence of a defendant's capacity to exercise volition and control behavior in order to decide whether he knew the nature of his act and that it was wrong. *Id.* 294 Minn. at 44, 199 N.W.2d at 789. In *State v. Wendler*, 312 Minn. 432, 252 N.W.2d 266 (1977), and *State v. Larson*, 281 N.W.2d 481 (1979), we made clear that *Rawland* only meant that the jury could hear evidence of cognition, volition, and capacity to control behavior; it did not alter the standard for a legal finding of insanity. 312 Minn. at 434, 252 N.W.2d at 267–688; 281 N.W.2d at 486.

■ In *State v. Linder*, 304 N.W.2d 902 (Minn.1981), we stated the standard for review of a jury finding on mental illness: "Substantial deference is accorded the jury's evaluation of the testimony on mental illness, and we have often said that the jury is the sole judge of the believability and weight of the testimony." *Id.* at 907 (citations omitted). We will not disturb the jury's conclusions, even where the only expert testimony concerning insanity was unrebutted, if there is sufficient other evidence to contradict the expert's opinion. *State v. Hoskins*, 292 Minn. 111, 137–38, 193 N.W.2d 802, 819 (1972).

■ Here, Dr. Malmquist testified that defendant knew the nature and wrongfulness of his act, but that defendant's volition and capacity to control his behavior were impaired. Perhaps the jury did not believe the testimony. If so, we will not disturb their conclusion as long as there is evidence to support the verdict. Defendant argues that other evidence in the record also supports the conclusion that he lacked the capacity to control his behavior. Defendant contends that the fact that he immediately reported the crime, that he did so calmly and without emotion, and that he failed to tell the police of the sexual violation of Ms. John's body indicates that he was so overwhelmed by his sexual conflict

that he was unable to control his behavior. However, the jury may have viewed these acts otherwise. By his own admission, the defendant confessed immediately after the baker saw him in the building because he believed that the baker would be able to connect him with the crime. The jury could have believed that the defendant confessed because he thought detection was inevitable and not because he was flooded by guilt over finally giving vent to his long-standing sexual conflict. Similarly, the fact that defendant did not mention the sexual violation of the body when he confessed does not necessarily indicate that the intensity of his sexual conflict impaired his volition to control his behavior. The jury could have believed that appellant did not mention the rape because he thought the rape of a corpse would be an additional crime which the police would not discover unless he confessed to it.

In addition, there was evidence which could directly support a finding that the defendant had the capacity to control his behavior. For example, there was testimony that he had been able to control his rape impulses in the past. More important, the defendant stood on the stage with his knife for up to 45 minutes until Ms. John came to get her coat. Dr. Malmquist testified that Mr. LaTourelle was struggling with his sexual conflict during that time period and that he was powerless to leave. However, this assessment is based on Mr. LaTourelle's version of the story. The jury could have believed that Mr. LaTourelle stood in wait for Ms. John. Considering the jury's opportunity to observe the defendant, we think there was sufficient evidence to support the verdict.

Even if the jury did believe that defendant's volition and capacity were impaired, our decisions make it clear that those factors are not determinative. The test remains whether the defendant knew the nature of his act and that it was wrong. Dr. Malmquist testified numerous times that defendant knew the nature and wrongfulness of his actions. Therefore, the defendant failed to prove mental illness by a preponderance of the evidence.

2. Defendant next argues that he was entitled to a jury instruction mentioning volition, cognition, and capacity to control behavior under our decision in *State v. Rawland*, 294 Minn. 17, 199 N.W.2d 774 (1972).

In *State v. Larson*, 281 N.W.2d 481 (1979), we considered whether the defendant there was entitled to an instruction on capacity to control behavior. As in this case, the defendant in *Larson* argued that *Rawland* required such an instruction. However, we stated that:

[E]vidence regarding capacity to control behavior may be admitted, but, as we stated in *State v. Wendler*, 312 Minn. 432, 434, 252 N.W.2d 266, 268 (1977), "the standard for a legal finding of insanity was not altered" by *Rawland*. We hold that an instruction on capacity to control behavior need not be given.

*Larson*, 281 N.W.2d at 486 (footnote omitted). *Larson* is dispositive of the issue here.

3. The defendant argues that Minn.Stat. § 609.04 (1982) forbids more than one conviction under the facts in this case. Section 609.04 is as follows:

Subdivision 1. Upon prosecution for a crime, the actor may be convicted of either the crime charged or an included offense, but not both. An included offense may be any of the following:

(1) A lesser degree of the same crime; or

(2) An attempt to commit the crime charged; or

(3) An attempt to commit a lesser degree of the same crime; or

(4) A crime necessarily proved if the crime charged were proved; or

(5) A petty misdemeanor necessarily proved if the misdemeanor charge were proved.

Subd. 2. A conviction or acquittal of a crime is a bar to further prosecution of any included offense, or other degree of the same crime.

In *State v. Bowser*, 307 N.W.2d 778 (Minn.1981), defendant was convicted of two counts of criminal sexual conduct on the basis of a single act. One count was defined by Minn.Stat. § 609.342(e)(i) (1980) (penetration resulting in personal injury), the other by Minn.Stat. § 609.342(c) (1980) (penetration causing fear of bodily harm). We held that section 609.04 prohibited conviction on more than one count. *Id.* at 779.

■ The facts here are almost exactly parallel to the facts in *Bowser:* multiple convictions under different sections of the statute for a single criminal act. In fact, the two felony murder convictions in this case are based on separate charges of criminal sexual conduct under the very same statute that was examined in *Bowser.* Thus, only one conviction can be sustained.

■ We hold that the proper procedure to be followed by the trial court when the defendant is convicted on more than one charge for the same act is for the court to adjudicate formally and impose sentence on one count only. The remaining conviction(s) should not be formally adjudicated at this time. If the adjudicated conviction is later vacated for a reason not relevant to the remaining unadjudicated conviction(s), one of the remaining unadjudicated convictions can then be formally adjudicated and sentence imposed, with credit, of course, given for time already served on the vacated sentence.

Affirmed; Counts I and III vacated; remanded for action consistent with this opinion.