**STATE of Minnesota, Plaintiff,**

v.

**Douglas James BRINK, Defendant.**

**No. C5–92–2445.**

Court of Appeals of Minnesota.

June 1, 1993.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Michael O. Freeman, Hennepin County Atty., J. Michael Richardson, Asst. County Atty., Minneapolis, for plaintiff.

William R. Kennedy, Hennepin County Public Defender, Peter W. Gorman, Asst. County Public Defender, Daniel E. O'Brien, Asst. County Public Defender, Minneapolis, for defendant.

Considered and decided by SHORT, P.J., and NORTON and KLAPHAKE, JJ.

## OPINION

SHORT, Judge.

This appeal involves the admissibility of expert psychiatric testimony based on the meaning of the phrase "to know the nature of the act" in Minn.Stat. § 611.026 (1990). Douglas James Brink was charged with two counts of attempted first-degree murder and one count of second-degree assault in violation of Minn.Stat. §§ 609.185(4), 609.17, 609.222 (1990). Brink asserted a defense of not guilty by reason of mental illness or deficiency under Minn.Stat. § 611.026 and Minn.R.Crim.P. 14.01(c). Following psychological examination under Minn.R.Crim.P. 20, Brink made a motion to admit certain expert testimony during phase II of the bifurcated trial. The trial court granted the motion and certified the following question:

> Should a defendant in support of an insanity defense to Attempted Murder in the First Degree be allowed to introduce expert psychiatric testimony to the effect that his actions on the evening in question were consistent with the specific intent to commit suicide rather than with the specific intent to murder?

We answer the certified question in the negative, but affirm the trial court's evidentiary ruling.

## FACTS

On February 26, 1992, while Brink was at home during the day with his eleven-year-old son, he became upset when the boy refused to clean his room. The boy telephoned his mother at work who told Brink to leave their son alone. Brink exploded and yelled at his wife. For the remainder of the day, Brink sat alone in his bedroom. When his wife came home from work that evening, she took their three children to her sister's house because Brink was in a "foul" mood. As she left, Brink threw a boom box at her. Brink, who had neglected to eat lunch or dinner, began drinking a six-pack of beer. Because Brink was angry at himself for driving his wife away, he punched a couple of holes in the wall and cut his wrist on a picture frame. When his wife returned home about an hour and a half later, she saw blood all over and noticed that Brink was armed with a shotgun. She left immediately and telephoned the police.

When the police arrived at the house, they tried to negotiate with Brink by telephone. After negotiations failed, the police officers approached the house. Brink fired his gun from an upstairs window and hit a truck driving past the house. The officers called for more police assistance. Brink fired eight more shots at a gas meter outside the house, and the police decided to use tear gas. As two officers approached the house, Brink fired two shots directly at the officers. The first shot narrowly missed one officer's head; the other shot hit the second officer and lodged in his protective vest. Brink finally surrendered an hour later.

During a Rule 20 psychological examination, Brink told the psychiatrist: (a) he loaded his gun because he was contemplating suicide; (b) he shot at his window when he saw a flashlight shine through it because he believed he wouldn't be able to commit suicide if the police were present; and (c) he did not want to harm the police, but rather to "warn them off" and later to have them shoot back and kill him. In his report, the psychiatrist concluded: (a) Brink was suffering from serious depres-

sion which easily could have culminated in suicide; (b) Brink saw the shoot-out as a way out of his dilemma of not finding the strength to kill himself; (c) Brink "literally" knew the nature of his actions, i.e., that he was shooting at the police; and (d) Brink also saw his actions as a suicide attempt that would be accomplished by the shoot-out.

Brink's attorney moved the trial court to allow the psychiatrist's testimony as to whether Brink knew the nature of his acts. The trial court granted that motion and certified the question as important and doubtful.

## ISSUES

I. Should a defendant in support of an insanity defense to attempted murder in the first degree be allowed to introduce expert psychiatric testimony to the effect that his actions on the evening in question were consistent with the specific intent to commit suicide rather than with the specific intent to murder?

II. Did the trial court err in granting the motion to allow the expert testimony during the insanity defense phase of the trial?

## ANALYSIS

### I.

■ Minn.R.Crim.P. 20.02 requires a bifurcated trial procedure whenever a defendant pleads not guilty and also raises the defense of insanity. Minn.R.Crim.P. 20.02, subd. 6(2). Under the bifurcated trial procedure, the state must prove the elements of the offense beyond a reasonable doubt in phase I of the trial or the defendant is entitled to acquittal. If the elements of the crime are proved, the defense of mental

illness or deficiency is then tried in phase II. *State v. Jackman,* 396 N.W.2d 24, 28 (Minn.1986).[1] *See generally* Minn.Stat. 611.026 (1990) (criminal responsibility of mentally ill or deficient persons). In its order, the trial court ruled the proffered expert testimony was admissible during phase II of the bifurcated trial, but inadmissible during phase I. The trial court then certified the question as important and doubtful in light of *State v. Provost,* 490 N.W.2d 93 (Minn.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1306, 122 L.Ed.2d 694 (1993).

■ Before certifying a question under Minn.R.Crim.P. 28.03, a trial court must decide and specify the precise legal question certified for review. *Thompson v. State,* 284 Minn. 274, 277, 170 N.W.2d 101, 103 (1969); *State v. Braun,* 354 N.W.2d 886, 887 (Minn.App.1984). The trial court's question does not indicate whether the evidence is to be considered for admission at phase I or phase II.[2] The parties agree the trial court certified an imprecise question, and ask us to rewrite the question in several significant ways. While we are mindful of authority permitting us to clarify a certified question, *see, e.g., State v. Wicks,* 258 N.W.2d 598, 600 (Minn.1977) (supreme court reworded certified question), we decline to do so because we are uncertain which issue the trial court believed was "important and doubtful" in light of the holding in *Provost.* Accordingly, we evaluate the question as certified to us under existing rules of law in the context of both phase I and phase II evidence.

### A. Phase I

■ The first part of a bifurcated trial focuses solely on whether the state has proved beyond a reasonable doubt that the defendant is guilty of the crime charged.

---

**1.** A defendant may not circumvent the mandatory bifurcated procedure through the form of his or her plea. If a defendant enters a single plea of not guilty by reason of mental illness and refuses to plead as to the elements of the crime, Minn. R.Crim. P. 14.02 authorizes the trial court to enter a plea of not guilty on the defendant's behalf and thus preserve the bifurcated trial procedure. *Jackman,* 396 N.W.2d at 29.

**2.** In addition, the question as certified is problematic because it sets up an "either-or" approach by stating the expert testimony will show Brink's actions were consistent with the intent to commit suicide *rather than* to murder. It is possible to imagine a situation where a defendant would have the intent both to commit suicide and to murder.

Minn.R.Crim.P. 20.02, subd. 6. During this "guilt or innocence" phase, the jurors look at the defendant's actions and rely on their own perceptions, experiences, and common sense to determine whether the defendant formed the specific intent necessary for the crime. *Provost*, 490 N.W.2d at 102; *State v. Bouwman*, 328 N.W.2d 703, 705 (Minn. 1982). At this stage, the defendant has the right to introduce all competent, relevant evidence disputing the facts upon which the inference of the fact of intent is sought to be established by the prosecution. *Bouwman*, 328 N.W.2d at 705. The question certified to us involves the admissibility of expert psychiatric testimony. As a general rule, such evidence is not admissible in phase I. *See Provost*, 490 N.W.2d at 104 (it is the fact finder's job, not the expert's as a "thirteenth juror," to look at what the defendant said and did to determine whether the defendant had the requisite intent); *Bouwman*, 328 N.W.2d at 705 (psychiatric testimony is of no probative value during phase I because it does not relate to the evidence the jury uses to determine specific intent). Expert psychiatric testimony is of no probative value at this point because such evidence relates to the defendant's mental capacity and is properly part of the defendant's case in phase II, wherein he or she must establish the defense of mental illness under Minn.Stat. § 611.026. *Bouwman*, 328 N.W.2d at 705. At phase I, such evidence, relative to the state's obligation to establish the defendant's specific intent, is merely argumentative. *Id.* For these reasons, "expert psychiatric testimony to the effect that [a defendant's] actions on the evening in question were consistent with the specific intent to commit suicide rather than with the specific intent to murder," like other expert psychiatric testimony bearing on specific intent,[3] is inadmissible at phase I of a bifurcated trial.

**B. Phase II**

The second part of an insanity trial is devoted solely to a consideration of whether the defendant has proved the statutory defense of mental illness by a preponderance of the evidence. *State v. Hoffman*, 328 N.W.2d 709, 717 (Minn.1982). During this "insanity" phase, the jurors decide whether the defendant lacked the capacity to form the intent to commit the crime with which he or she is charged. *Bouwman*, 328 N.W.2d at 705. As a general rule, a trial court may admit expert psychiatric testimony during phase II whenever such evidence is competent and relevant to show the defendant's cognition, volition, and capacity to control his or her behavior. *State v. Rawland*, 294 Minn. 17, 44, 199 N.W.2d 774, 789 (1972).

However, "expert psychiatric testimony to the effect that [the defendant's] actions on the evening in question were consistent with the specific intent to commit suicide rather than with the specific intent to murder" does not fall within the category of competent, relevant phase II evidence. Such evidence is tantamount to an expert opinion on Brink's specific intent to commit the crime with which he is charged. For example, if the jury finds Brink guilty during phase I, admission of the proffered expert testimony during phase II effectively would declare that the jury's guilty verdict was wrong. This is precisely the type of testimony the bifurcation procedure is designed to exclude. *See Jackman*, 396 N.W.2d at 28 (mandatory bifurcation promotes policy goal of excluding psychiatric testimony regarding intent). Such evidence is excluded from phase II because admission of expert testimony on specific intent would undermine the bifurcated trial procedure. *Provost*, 490 N.W.2d at 102 n. 8; *Bouwman*, 328 N.W.2d at 705. Under existing rules of

---

**3.** In *Provost*, the supreme court alluded to situations when expert testimony might be admissible on the issue of specific intent. *Provost*, 490 N.W.2d at 103. Such situations, however, are extremely rare, *id.*, and Brink's situation does not fall into this very limited group of situations because the proposed expert testimony explains neither a mental disorder "characterized by a

specific intent different from the requisite mens rea," nor a disorder characterized by the formation of a particular subjective state of mind inconsistent with the pertinent criminal mens rea. *Id.* The proposed expert testimony is, in fact, no different from the usual type of evidence introduced at phase II.

law, the type of expert testimony described in the question certified to us is inadmissible at phase II. For these reasons, we answer the trial court's certified question in the negative.

## II.

■ Ordinarily, a pre-trial evidentiary ruling in a criminal case is not appealable and certification by the trial court cannot be used to circumvent this rule. *State v. Bristol*, 276 Minn. 158, 160–62, 149 N.W.2d 84, 86–87 (1976); *State v. Kvale*, 352 N.W.2d 137, 140 (Minn.App.1984). However, the certified question does not fully reflect the expert testimony on the record. The certified question refers to Brink's actions rather than his volition or capacity to control his behavior, and suggests the testimony would negate Brink's intent to commit murder. As we read the record, however, the proffered testimony describes Brink's cognition rather than his actions. Thus, we separately evaluate the trial court's decision to admit the expert's testimony during phase II of Brink's trial in order to avoid confusion at trial.

■ The trial court has broad discretion in deciding whether to admit testimony by a qualified expert. Minn.R.Evid. 702; *State v. Helterbridle*, 301 N.W.2d 545, 547 (Minn.1980). It is within the trial court's discretion to admit expert testimony regarding the effect of insanity on mental capacity in phase II of a bifurcated trial. *State v. Fratzke*, 354 N.W.2d 402, 409 (Minn.1984). Such testimony is relevant to show whether the defendant "was laboring under such a defect of reason * * * as not to know the nature of the act, or that it was wrong." Minn.Stat. § 611.026.

Before 1972, Minnesota courts held section 611.026 was clear and unambiguous in allowing defendants to raise the insanity defense only as it bore on cognition. Thus, for example, Minnesota courts have rejected the "irresistible impulse" test which would relieve a defendant of criminal responsibility if he or she acted under a mental disease which made his or her act irresistible regardless of whether he or she knew the act was wrong. *State v. Finn*, 257 Minn. 138, 141, 100 N.W.2d 508, 511 (1960). "If more adequate standards of determining criminal responsibility can be devised, it is the function of the legislature, not this court." *Id.* at 144, 100 N.W.2d at 513.

■ In *Rawland*, the Minnesota Supreme Court enlarged the interpretation of Minn.Stat. § 611.026. Prompted by its recognition of a defendant's fundamental right to freedom of choice and the legislature's elimination from the criminal code of Minn.Stat. § 610.09 (1963) (morbid propensity to commit a crime is not a defense), the supreme court held the fact finder can hear evidence bearing not only on cognition but also on volition and capacity to control behavior. *Rawland*, 294 Minn. at 43–44, 199 N.W.2d at 789. Under *Rawland*, as a general rule, evidence is freely admitted on the issue of mental illness so the fact finder can take account of the entire person of the defendant and his or her mind as a whole. *Id.* at 44, 199 N.W.2d at 790 (quoting *Pope v. United States*, 372 F.2d 710, 736 (8th Cir.1967)). Such evidence includes all competent evidence relating to cognition, volition, and the defendant's capacity to control his or her behavior. *State v. Larson*, 281 N.W.2d 481, 486 (Minn.1979), *cert. denied*, 444 U.S. 973, 100 S.Ct. 467, 62 L.Ed.2d 388 (1979); *Rawland*, 294 Minn. at 44, 199 N.W.2d at 789.

■ The *Rawland* court stressed, however, that the basic test for the insanity defense under section 611.026 of not knowing the nature of the act and that it was wrong remained unchanged. *Rawland*, 294 Minn. at 45, 199 N.W.2d at 790. Later cases have echoed *Rawland*'s reasoning. *See, e.g., State v. LaTourelle*, 343 N.W.2d 277, 282 (Minn.1984) (standard for insanity not changed by *Rawland*, though fact finder may consider competent evidence relating to cognition, volition, and capacity to control behavior); *State v. Wendler*, 312 Minn. 432, 434, 252 N.W.2d 266, 267–68 (Minn.1977) (same). Under the rule of *Rawland*, section 611.026 provides the test for insanity, but does not limit a trial court's power to determine what evidence the fact finder may consider. *Rawland*,

294 Minn. at 41, 199 N.W.2d at 787. Expert psychiatric testimony is but one type of competent evidence and the jury, if properly instructed, will be able to weigh it accordingly. *See State v. Hoskins*, 292 Minn. 111, 137, 193 N.W.2d 802, 819 (1972) (jury is not bound by expert testimony pertaining to defendant's sanity).

In *Bouwman*, the Minnesota Supreme Court once again confronted the admissibility of expert psychiatric testimony when the defendant raises the insanity defense. *Bouwman*, 328 N.W.2d at 705. The supreme court stated that, during phase II of a bifurcated trial,

[t]he question becomes whether the defendant, even though he has manifested the specific intent to do the thing that he did, was laboring under such a defect of reason that he lacked the capacity to form the intent that was otherwise manifested. * * * On this issue of capacity, expert psychiatric testimony has probative value. *The inquiry is no longer on the direction the defendant's mind took but on how the defendant's mind worked.*

*Id.* (emphasis added). Under *Bouwman*, however, the relevant evidentiary prohibition remains: expert psychiatric testimony is not admissible in phase I to show that a defendant lacked the mental capacity to have formed the specific intent on which criminal liability is to be based. *Id. Bouwman*'s legal distinction between intent determined during phase I and mental capacity determined during phase II allows a "final decisive moral judgment of the culpability of the accused" and recognizes that for the purpose of conviction there is "no twilight zone between abnormality and insanity." *Id.* at 706.

The supreme court clarified *Bouwman* in its *Provost* opinion, holding that during phase I of a bifurcated trial, psychiatric opinion testimony on whether the defendant had the requisite subjective mens rea or the capacity to form it is inadmissible. *Provost*, 490 N.W.2d at 104. Other psychiatric opinion testimony usually is inadmissible except in a few instances, such as to explain a mental disorder "characterized by

a specific intent different from the requisite mens rea," or when a defendant's mental history is relevant. *Id.* The *Provost* court gave an example of when expert opinion testimony might be admissible on the issue of mens rea:

If, for example, there was a mental disorder characterized by the formation of a particular subjective state of mind *inconsistent* with the pertinent criminal mens rea, opinion testimony about such a mental condition might be admissible. These situations, however, are very rare.

*Id.* at 103 (emphasis added).

■ Under *Rawland, Bouwman,* and *Provost*, we conclude the expert's testimony is admissible during phase II of Brink's trial on the issue of whether Brink had "such a defect of reason that he lacked the capacity to form the intent that was otherwise manifested." *Bouwman*, 328 N.W.2d at 705. We remain aware of the danger of an expert psychiatric witness being no more than a conduit for a defendant's self-serving testimony. *See Provost*, 490 N.W.2d at 100 ("Trial and appellate courts are literally bombarded by irrelevant, confusing, and prejudicial testimony from mental health professionals who either do not understand what the law requires of them or who have not-so-hidden agendas.") (quoting Stephen J. Morse, *Undiminished Confusion in Diminished Capacity*, 75 J.Crim.L. & Criminology 1, 37 (1984)). At the same time, because an expert psychiatric witness can testify as to the ultimate question under section 611.026 (i.e., whether the defendant knew the nature of the act and that it was wrong), the expert also can testify as to the reasons underlying his or her opinion. *See, e.g., State v. Malley*, 285 N.W.2d 469, 472 (Minn.1979) (psychologist testified that defendant's mental condition of obsessive compulsive schizoid personality with involutional paranoid depression psychosis permitted defendant to realize the nature of the act but not that it was wrong; psychologist also "reconstructed the defendant's thought processes" at the time of the incident); *State v. Bott*, 310 Minn. 331, 333–34, 246 N.W.2d 48, 51 (Minn.1976) (no error in allowing psychiatrist to testify that defendant told him his

intent was not merely to harm but to kill and to give his opinion that defendant knew the nature of his act and that it was wrong); *State v. Bergstrom*, 413 N.W.2d 206, 208–09 (Minn.App.1987) (psychiatrist testified that defendant was manic depressive and exhibited suicidal thinking during spells of severe depression, and that she knew the nature of her acts in that she knew she was trying to kill herself).

 The state argues admitting the expert's testimony would be the first step towards admitting evidence of diminished capacity or diminished responsibility. We disagree. The *Provost* court addressed that concern in dicta, stating that during the insanity defense phase of a bifurcated trial, "there is no need to worry about any confusing spill-over of diminished capacity." *Provost*, 490 N.W.2d at 101 n. 5. The doctrines of diminished responsibility and diminished capacity permit the fact finder to consider a *sane* defendant's mental abnormality when determining the defendant's degree of criminal liability and are supplemental to the insanity defense. Peter Arenella, *The Diminished Capacity and Diminished Responsibility Defenses: Two Children of a Doomed Marriage*, 77 Colum.L.Rev. 827, 828 (1977). They are considered "partial defenses" because they do not completely exonerate the defendant but merely reduce the degree or nature of the crime. *Id.* We are admitting the testimony only in phase II, however, when *insanity*, not guilt, is at issue. The doctrines of diminished capacity and diminished responsibility simply do not apply to phase II.

The evidence Brink seeks to introduce during phase II falls within the definition of competent evidence relating to cognition, volition, and Brink's ability to control his behavior. *Larson*, 281 N.W.2d at 486; *Rawland*, 294 Minn. at 43, 199 N.W.2d at 789. In his report, the expert acknowledges that Brink and the police officers agree on the basic facts of what happened on February 26, but states that his testimony will supply "motivational components" that are lacking in the police reports. The expert's report describes Brink as a self-critical individual with low self-esteem, suffering from a severe mental illness in the form of a major mood disorder. This condition, in the expert's opinion, "began to unfold in its more serious manifestations" in the several months before this shoot-out incident. By the time of the incident, according to the expert, Brink was in a state of serious depression "which could have easily culminated in suicide." The expert's descriptions of Brink's condition provide a "context" for Brink's actions. The expert's opinion is that while Brink cognitively knew that he had a gun and was shooting at people, Brink also saw his behavior, because of his mentally disordered thinking, as a "way out of his dilemma." According to the expert, on that disordered level, Brink "would not have known the nature of his act."

This evidence is competent phase II evidence illustrating Brink's mental capacity within the meaning of *Bouwman*. The expert's testimony does not transgress the line between intent and capacity that the supreme court drew in *Bouwman;* rather, the jury will be able to pass moral judgment on Brink's culpability in phase I, while retaining the opportunity to consider in phase II whether Brink is an offender who, because of his mental condition, cannot justly be held responsible for his actions. *See* Joseph M. Livermore & Paul E. Meehl, *The Virtues of M'Naghten*, 51 Minn.L.Rev. 789, 855 (1967) (Minnesota's insanity test allows a judgment as to whom we cannot reasonably expect to comply with the law and isolates those persons whose sense of reality and ability to think rationally is crudely impaired).

The expert's testimony will portray Brink as "a man severely depressed" who, on the night of the incident, may have been carrying out motives that were "not consciously registering." The expert plans to testify that a decision to commit suicide was not Brink's conscious thought on the night in question. Rather, Brink was "immobilized" by his mental disorder. According to the expert, his testimony will "tend to show what may have been going on in [Brink's] mind." Such evidence does not constitute impermissible evidence bearing

on Brink's specific intent,[4] but rather is a prime example of competent and relevant evidence showing "how the defendant's mind worked" within the meaning of *Bouwman*. It will be helpful to the jury during phase II, as the jury determines whether Brink should be excused from criminal liability under section 611.026. The trial court properly admitted the evidence.

## DECISION

The trial court's certified question regarding expert psychiatric testimony to the effect that Brink's actions were consistent with the specific intent to commit suicide rather than to murder is answered in the negative. The trial court's order allowing, during phase II of the bifurcated trial, expert psychiatric testimony on how Brink's mind worked and whether he knew the nature of his acts at the time of the alleged crimes is affirmed.

**Affirmed, but certified question answered in the negative.**

---

**4.** Neither in his report nor in the transcript of his proposed testimony does the expert use the word "intent." The parties' and trial court's use of the word "intent" to describe the workings of Brink's mind is a confusing overlap of the word's colloquial, everyday meaning with its focused and particular legal meaning. Webster's Ninth New Collegiate Dictionary gives "volition" as a synonym for "intent," Webster's Ninth New Collegiate Dictionary 629 (1986), and *Rawland* states specifically that expert psychiatric testimony is admissible to show volition. *Rawland*, 294 Minn. at 44, 199 N.W.2d at 789. The expert may not testify as to Brink's specific intent to commit murder (an element of the crime), because, as the supreme court indicated in *Bouwman* and *Provost*, the admission of such testimony during phase II would undermine the mandatory bifurcated trial procedure. The expert may, however, testify as to Brink's wishes, desires, and feelings because such testimony will illuminate Brink's volition and his capacity to control his behavior, as *Rawland* describes.