STATE of Minnesota, Respondent,

v.

Donald Floyd LARSON, Appellant.

No. 47518.

Supreme Court of Minnesota.

May 25, 1979.

Rehearing Denied July 12, 1979.

Meshbesher, Singer & Spence, Ronald I. Meshbesher, and Carol M. Grant, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., Thomas L. Fabel, Deputy Atty. Gen., and Gary Hansen, Spec. Asst. Atty. Gen., St. Paul, Thomas J. Ryan, County Atty., Pine City, for respondent.

Heard before ROGOSHESKE, PETERSON, and YETKA, JJ., and considered and decided by the court en banc.

ROGOSHESKE, Justice.

Defendant Donald Floyd Larson was found guilty by a district court jury on one count of first-degree murder (fatally shooting his neighbor and former friend, James Falch, Sr.), two counts of second-degree murder (fatally shooting his wife, Ruth, and

Falch's oldest son, James Falch, Jr.), and one count of third-degree murder (fatally shooting his son, Mark), and was acquitted by reason of mental illness on one count of first-degree murder (fatally shooting his stepson, Scott Powell). He was sentenced to concurrent terms of imprisonment for life, 40 years, 40 years, and 25 years. The principal issues presented by defendant's appeal from the judgment of conviction are whether the trial court abused its discretion by refusing to hold a post-verdict hearing to impeach the verdict for alleged jury misconduct and whether the trial court properly instructed the jury. We hold that the court did not abuse its discretion in denying a post-verdict hearing and any errors in instructing the jury were not prejudicial beyond a reasonable doubt.

The evidence justified the jury in finding these very abbreviated and essential facts: In January 1976 defendant learned that his wife, Ruth, was having an affair with their neighbor, James Falch, Sr., who resided on an adjoining farm. He agreed to his wife's request for a divorce. On April 23, 1976, Ruth, who had admitted being intimate with Falch, ridiculed defendant concerning his ability as a lover, demanded all of defendant's machinery as part of a property division, and threatened to deprive defendant of the opportunity to see their 5-year-old son, Mark, the only child of their marriage.

On April 24, 1976, defendant returned to his farm after a trip to the Twin Cities to discover James Falch, Sr.'s pickup truck and trailer filled with items which had been loaded from defendant's house. Defendant encountered Falch and his wife on the porch of the farmhouse and punched Falch in the mouth, threatening to kill him. Defendant drew two pistols, acquired and loaded before he came to the farm, and shot Falch in the shoulder. Defendant turned from the house and was confronted by Falch's son, James Falch, Jr., age 12, who, having witnessed defendant's acts and heard his threats, screamed and swore at defendant. Defendant shot Falch's son at close range three times, killing him. Returning to the house, defendant tried to

prevent his wife from calling the police. As he was struggling with her, one of the pistols discharged, killing their 5-year-old son, Mark. Defendant then raised the gun and shot his wife in the back of her head twice, killing her. Defendant next turned to Falch and shot him in the back of the head, causing his death. Defendant then went outside and ordered two of Falch's sons, Stephen, age 8, and Bradley, age 6, and Scott Powell, age 12 (Ruth's son by a previous marriage), to get out of the trailer. When they failed to move, he pulled the trigger of one of his pistols. Upon finding both pistols empty, defendant reloaded. The two Falch boys ran into the field and escaped, but Scott Powell ran into the house, where, confronted with the bodies of his mother and half brother, he began to cry and scream uncontrollably. Defendant, who followed Scott into the house and tried unsuccessfully to stop his hysterical screams, shot him in the head and killed him.

Defendant then picked up the empty cartridges and the keys to all the vehicles and sped to Minneapolis. In Minneapolis, he threw both pistols and his jacket into the Mississippi River. He abandoned his car and checked into a motel, where he was found in a semiconscious state after ingesting pills and vodka.

The issues raised by defendant are: (1) Did the trial court abuse its discretion by refusing to hold a summary hearing to impeach the verdict? (2) Were the trial court's instructions erroneous and prejudicial to defendant's right to a fair trial? (3) Did the trial court abuse its discretion in allowing the jury to view photographs of the dead bodies of two of the children and defendant's wife, or in allowing the jury to hear James Falch, Sr.'s tape-recorded dying declaration? (4) Is the verdict of not guilty by reason of mental illness of the death of Scott Powell reversibly inconsistent with the verdicts of guilty of the deaths of four other persons?

■ Defendant's principal contention is that the trial court abused its discretion by

failing to hold a post-verdict hearing to impeach the verdict. Defense counsel moved for such hearing, pursuant to Rule 26.03, subd. 19(6), Rules of Criminal Procedure,[1] citing *Schwartz v. Minneapolis Suburban Bus Co.*, 258 Minn. 325, 104 N.W.2d 301 (1960). The grounds for the motion were that newspaper interviews of several jury members after discharge of the jury and a statement of a juror heard by defense counsel that defendant had been in trouble before revealed prejudicial juror misconduct. In the newspaper interviews, one juror expressed the opinion that the mental illness defense is "just an easy way out," despite stating on voir dire that he was not skeptical or doubtful of the mental illness defense. Another stated that "as someone in the law enforcement business, I have to believe it's wrong to excuse things like this," despite expressing on voir dire that he was not doubtful of the mental illness defense.

The trial court refused to conduct a post-trial hearing, stating:

"I am going to deny the motion of the defendant for a summary hearing. I think we have rather covered that. I will state again, and it may be repetition, that all of the arguments that have been presented to me relative to any personal feeling on the part of [jurors] Mans or Soderquist about the defense of mental illness is clearly negated because of the fact that they did join in a verdict of not guilty by reason of mental illness in the one case [the victim Scott Powell], which to me is just absolute evidence that they followed the Court's instructions generally in considering that [the defendant's mental illness defense]."

Rule 26.03, subd. 19(6), Rules of Criminal Procedure, codifies for criminal cases the procedures outlined by this court in *Schwartz v. Minneapolis Suburban Bus Co.*, 258 Minn. 325, 104 N.W.2d 301 (1960), for civil cases. In *Zimmerman v. Witte*

*Transp. Co.*, 259 N.W.2d 260, 262 (Minn. 1977), we set out the standard of review and purpose of a *Schwartz* hearing:

"The granting of a *Schwartz* hearing is generally a matter of discretion for the trial court. Its purpose is to avoid harassment of jurors and to provide a record on appeal in cases where, after the jury renders the verdict, the losing party becomes aware of facts which indicate the possibility of jury misconduct."

In *Olberg v. Minneapolis Gas Co.*, 291 Minn. 334, 343, 191 N.W.2d 418, 424 (1971), we further clarified that "[n]othing should prevent the trial court from ordering a *Schwartz* hearing on the grounds of an oral assertion by counsel or hearsay affidavit" and "[t]he trial courts * * * should be liberal in granting a hearing." Rule 26.03, subd. 19(6), implicitly requires defendant to establish a prima facie case of jury misconduct before a *Schwartz* hearing is mandated. To establish a prima facie case, a defendant must submit sufficient evidence which, standing alone and unchallenged, would warrant the conclusion of jury misconduct. See, *State v. Lawlor*, 28 Minn. 216, 223, 9 N.W. 698, 702 (1881). Although the trial court may allow the prosecution to submit evidence rebutting jury misconduct, it may ignore that evidence in ordering a hearing. The trial court need not, however, blindly accept the assertions submitted by defense counsel.

In this case, the trial court was justified in ruling that the newspaper articles and other assertions by defense counsel did not demonstrate jury misconduct. Certainly, alleged statements of jurors reported in newspapers must be viewed skeptically. The edited version of what a reporter writes that he heard a juror say after trial may correspond very little to what a juror actually asserted and argued in the jury room during deliberations. Besides, as the trial court stated, the jurors, who allegedly

---

1. Rule 26.03, subd. 19(6), Rules of Criminal Procedure, provides: "Affidavits of jurors shall not be received in evidence to impeach their verdict. If the defendant has reason to believe that the verdict is subject to impeachment, he shall move the court for a summary hearing. If the motion is granted the jurors shall be interrogated under oath and their testimony recorded."

discounted the mental illness defense, concurred in a verdict which acquitted defendant by reason of mental illness of the killing of Scott Powell. Surely, a *Schwartz* hearing is not warranted every time a newspaper article can be read as revealing the possibility of jury misconduct. As for the juror who stated in the presence of defense counsel that "this isn't the first time the defendant has been in trouble," the most convincing explanation is not that the juror was deceitful on voir dire when he said he did not know defendant's history. It is more plausible that the juror was simply repeating the testimony of one of the expert witnesses that defendant admitted having been in trouble most of his life. Although trial courts should generally be liberal in granting *Schwartz* hearings in both civil and criminal trials, we hold that the trial court was well within its discretion in ruling that the newspaper articles and affidavit of defense counsel did not establish a prima facie case of jury misconduct.

■ Defendant next argues that certain jury instructions were so prejudicial as to require a new trial. The trial court instructed the jury that defendant's plea of not guilty was not evidence of his innocence. We have recently stated that such an instruction is inadvisable, since it could have the effect of leading the jury to misunderstand or not accept the fundamental rule of the presumption of innocence.[2] *State v. Fossen*, 282 N.W.2d 496 (Minn. 1979). Where, as here, defendant's asserted defense was not guilty by reason of mental illness and the evidence that he in fact caused the deaths of the victims is uncon-

tradicted, we cannot believe the court's instruction could have prejudiced the jury. See, *State v. Jensen*, 308 Minn. 377, 242 N.W.2d 109 (1976); *State v. Sandve*, 279 Minn. 229, 156 N.W.2d 230 (1968).

■ Defendant next contends that the trial court erred by instructing the jury that Dr. Malmquist's testimony on mental illness was not entitled to more or less weight than the other two experts' testimony, merely because he was appointed by the court to examine defendant. Defendant argues that the jury should have been entitled to consider Dr. Malmquist's status as a court-appointed expert in weighing his credibility. Generally, the jury should be entitled to take into account the fact of an expert's court-appointed status in determining the amount of weight to accord his testimony, and the instruction given may therefore be regarded as error.[3] However, jury instructions are to be considered as a whole. *State v. Parker*, 282 Minn. 343, 358, 164 N.W.2d 633, 642 (1969). In this case, the judge also instructed the jury to consider the interest of each of the witnesses. Moreover, Dr. Malmquist's opinion that defendant knew what he was doing and that it was wrong negates defendant's contention that the jury would have found defendant mentally ill if they had given Dr. Malmquist's testimony more weight. In the context of all of the instructions given, we are not persuaded that defendant was prejudiced by the trial court's instruction to treat the testimony of all experts alike.

■ Defendant also argues that the trial court's instruction, placing the burden of

---

2. With respect to the presumption of innocence, we recommend an instruction similar to 10 Minnesota Practice, Jury Instruction Guides, CRIMJIG 3.02, which states: "That defendant is on trial, that he has been arrested, and that he has been brought before the court by the ordinary processes of the law should not be considered by you as in any way suggesting his guilt. The defendant is presumed to be innocent of the charge made against him, and that presumption abides with him unless and until he has been proved guilty of the charge beyond a reasonable doubt. · The burden of proving guilt is on the state; defendant does not have to prove his innocence."

3. We by no means wish to imply that the trial court should have specifically instructed that the jury could take into account the fact of Dr. Malmquist's court-appointed status. To do so would improperly single out the credibility of a particular witness. See, e. g., *State v. Bishop*, 289 Minn. 188, 183 N.W.2d 536 (1971); Rules of Criminal Procedure, Rule 26.03, subd. 18(5). We recommend that the jury be instructed to evaluate the credibility of witnesses by using the considerations set out in 4 Minnesota Practice, Jury Instruction Guides (2 ed.) Civil, JIG 21 G–S, which is equally valid for criminal as for civil cases.

proving mental illness on him, relieved the prosecution of proving intent and, therefore, denied him due process. This court has recently rejected that argument, upholding the constitutionality of Minn.St. 611.026 (acquittal due to mental illness). *State v. Bott,* 310 Minn. 331, 335, 246 N.W.2d 48, 52 (1976); *State v. Hoskins,* 292 Minn. 111, 134, 193 N.W.2d 802, 817 (1972). In the *Hoskins* case, this court noted that because the rule placing the burden of proving mental illness on defendant was established by statute, any change in the rule must come from the legislature. 292 Minn. 133, 192 N.W.2d 817.

▮ Defendant further contends that the trial court erred by instructing the jury that defendant is presumed responsible for his acts, thus undercutting the fundamentals of defendant's presumption of innocence. See, Minn.St. 611.025. This argument was rejected in *State v. Bott, supra.* We reaffirm our holding in *Bott* as to this issue and hold that a trial court may instruct the jury as to a defendant's presumption of responsibility in a case where defendant presents a mental illness defense. If this instruction is given, however, we think trial courts should avoid any possibility of confusing the jury as to the burden of proof by clearly distinguishing in the charge to the jury between the presumption of defendant's responsibility and the presumption of defendant's innocence.

▮ Defendant argues that the trial court erred by ignoring his "capacity to control behavior." His argument is based on his interpretation of our decision in *State v. Rawland,* 294 Minn. 17, 199 N.W.2d 774 (1972). In *Rawland,* we examined the standard for acquitting a defendant due to mental illness. We held that evidence should be freely admitted on the issue of mental illness and that the factfinder could give credence to competent evidence that relates to cognition, volition, and capacity to control behavior. 294 Minn. 46, 199 N.W.2d 790. The basic standard for acquit-

tal due to mental illness is contained in § 611.026, which provides:

"No person shall be tried, sentenced, or punished for any crime while mentally ill or mentally deficient so as to be incapable of understanding the proceedings or making a defense; but he shall not be excused from criminal liability except upon proof that at the time of committing the alleged criminal act he was laboring under such a defect of reason, from one of these causes, as not to know the nature of his act, or that it was wrong."

Defendant appears to argue that this court's decision in *Rawland* altered this standard. On the contrary, in *Rawland* we emphasized:

" * * * The basic question of fact remains, however, whether in the light of this burden and this evidence the defendant was laboring under such a defect of reason as not to know 'the nature of his act, or that it was wrong.' " 294 Minn. 46, 199 N.W.2d 790.

Evidence regarding capacity to control behavior may be admitted, but, as we stated in *State v. Wendler,* 312 Minn. 432, 434, 252 N.W.2d 266, 268 (1977), "the standard for a legal finding of insanity was not altered" by *Rawland.* We hold that an instruction on capacity to control behavior need not be given.[4]

▮ Defendant's claim that the trial court erred by refusing to instruct the jury as to the consequences of a verdict of not guilty by reason of mental illness is also without merit. We have recently rejected this argument in *State v. Carignan,* 271 N.W.2d 442 (Minn.1978). See, also, *State v. Bott,* 310 Minn. 331, 246 N.W.2d 48 (1976).

▮ Defendant next argues that the jury's verdict is reversibly inconsistent because it rejected the temporary mental illness defense for the first four killings and accepted it for the last killing. This argument is essentially one of the sufficiency of the evidence, since Minnesota law recog-

---

4. We recommend an instruction on the mental illness defense similar to 10 Minnesota Practice, Jury Instruction Guides, CRIMJIG 6.02[1].

nizes temporary mental illness. See, e. g., *City of Minneapolis v. Altimus*, 306 Minn. 462, 471, 238 N.W.2d 851, 857 (1976). Therefore, even though Minnesota law requires a consistent verdict, there is in our view of the testimony no inconsistency in the jury's verdict in this case. The jury was not compelled to find defendant either guilty of all five homicides or not guilty by reason of mental illness.

Dr. Schwartz testified on behalf of defendant that defendant was mentally ill when he shot all five victims, including Scott Powell, the fifth victim. The other two psychiatrists, however, offered no opinion as to defendant's state of mind at the time Scott was shot. Rather, each of them noted that defendant, though he recalled the other shootings, claimed to have no memory of the killing of Scott. These two psychiatrists did find, however, that for the first four murders defendant knew the nature of his acts and that they were wrong. Thus, the jury was faced with a division of the experts for the first four shootings, but with defendant's unopposed expert testimony as to the shooting of Scott Powell. There was sufficient evidence for the jury to find defendant guilty of homicide as to the first four victims. As to the fifth, Scott Powell, the jury apparently credited the opinion of the only psychiatrist who offered an opinion—Dr. Schwartz. "A jury, as the sole judge of credibility, is free to accept part and reject part of a witness' testimony." *State v. Poganski*, 257 N.W.2d 578, 581 (Minn.1977). This same rule also applies to expert opinion testimony. *State v. Hoskins*, 292 Minn. 111, 137, 193 N.W.2d 802, 819 (1972). It was within the jury's prerogative to find defendant guilty of four homicides, but that he lost his ability to distinguish right from wrong when he fatally shot Scott Powell.

■ The admission of three black-and-white photographs of the bodies of some of the victims, as they were found at the scene, was clearly proper. See, *State v. DeZeler*, 230 Minn. 39, 41 N.W.2d 313 (1950). The photographs were relevant to the location of the wounds, tending to prove premeditation and intent, and relevant to the position of the bodies, tending to prove the order of the shootings.

■ The admission of the tape-recorded dying declaration of James Falch, Sr., presents a closer question. Its vivid portrayal of a victim in a severely injured condition, who died 3 days later, is indeed sobering. However, we are persuaded that the evidentiary value of the tape recording is not substantially outweighed by its claimed prejudicial effect. See, Rule 403, Rules of Evidence. There can be no doubt about the probative value of the tape. It identified the assailant and contained information concerning the order of the shootings, the type of weapon, the motive, and defendant's state of mind at a time shortly after the shootings. We acknowledge that the claim of prejudicial effect of the tape recording is difficult to judge. However, while the recording was emotionally gripping, we believe it was offered and admitted to aid rather than to prejudice the jury's discharge of its awesome responsibility. The recording brings home the reality of the shootings in a way no testimony of witnesses or transcript of the recording could. We are not persuaded that the tape recording so inflamed the passions of the members of the jury as to interfere with the jury's discharge of its proper role and function.

Affirmed.