**STATE of Minnesota, Respondent,**

v.

**Michael Eugene CHURCH, Appellant.**

Nos. C6–97–1100, C8–96–1220.

Supreme Court of Minnesota.

April 23, 1998.

John M. Stuart, State Public Defender, Susan K. Maki, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey III, Attorney General, Robert M.A. Johnson, Anoka County Attorney, M. Katherine Doty, Asst. County Attorney, Anoka, for respondent.

## OPINION

STRINGER, Justice.

We consider here both the direct appeal of Michael Church's convictions for two counts of first-degree murder and one count of second-degree murder, and Church's appeal from denial of his petition for postconviction relief. Church challenges the sufficiency of the evidence to support his murder convictions and argues that the postconviction court abused its discretion by refusing to grant him a *Schwartz* hearing to determine if the jury was properly sequestered during a 22–minute recess in the trial. We affirm Church's convictions and the trial court's denial of Church's petition for postconviction relief.

Delphine Gallus, age 68, shared her home in Fridley, Minnesota with her brother-in-law 84–year–old Michael Gallus and her son 44–year–old Gregory Gallus. Delphine Gallus and Michael Gallus shared the household chores, usually ate dinner together and watched television before retiring for the night. Gregory Gallus was unemployed and had a drinking problem. He spent most of his time in the basement watching television and drinking. He usually ate later at night, between 11:00 p.m. and midnight. In late February 1995, the Galluses allowed 28–year–old Michael Church to stay at their home and he lived there until the end of March when the murders occurred. Gregory Gallus allowed Church to use his car in exchange for Church running errands for the Galluses. On several occasions, however, Gregory Gallus telephoned Church's friends to locate Church because Gallus wanted him to bring the car back. On March 24, Gregory Gallus called the police and reported the car stolen because Church had not returned with it, but the police would not file a criminal report because Church had permission to use the car.

Delphine Gallus' neighbor last saw her alive on Saturday, March 25, when they returned home from a shopping trip together around 5:00 p.m. Around the same time, the neighbor's husband saw Gregory Gallus' car drive by, but because the driver did not wave back, the neighbor did not think it was Gregory driving. The next morning, Sunday, March 26, the neighbor looked out her window around 6 a.m. and saw a bearded man standing in front of the Gallus' garage, smoking a cigarette. It struck her as odd because the Galluses permitted smoking in their house. A Star Tribune newspaper carrier testified that he delivered the Sunday newspaper to the Gallus' front steps between 6:00–6:30 a.m. and did not notice anything unusual at the house. The bodies of Delphine Gallus, Michael Gallus, and Gregory Gallus were discovered on Monday, March 27, after concerned relatives contacted the

Fridley police when no one answered the telephone or the door at the Gallus residence on Sunday, March 26 and Monday, March 27. Because Church had been living in the house, the police issued a statewide broadcast in an attempt to locate him for questioning.

The police noted that all the doors were locked when they arrived, and upon entering through a window, determined that a gun, a knife, and three televisions were missing from the house. The Sunday newspaper lay unopened in a green plastic bag on a chair in the living room. The body of Delphine Gallus was found lying on her bed in her pajamas; she had been stabbed in the heart. Michael Gallus' body was found lying on a waterbed in his bedroom with stab wounds and blunt force injuries to his face. He too was wearing pajamas. The medical examiner testified that the injuries were consistent with a fist or a narrow blunt instrument, possibly a gun stock found at the foot of the bed with a boot print on it that later was matched to the boots Church was wearing at the time of his arrest. Gregory Gallus' body was found in his recliner in the basement, dead from a stab wound in his chest. French fries and a bottle of ketchup with fingerprints on it, later identified to be Church's, lay on the tray table next to the recliner. The medical examiner estimated that all three deaths occurred 24 to 72 hours earlier.

The fact that Delphine Gallus and Michael Gallus were wearing pajamas when their bodies were found suggested that the crime occurred after their evening retirement. The medical examiner testified that based on an analysis of his stomach contents, it appeared that Gregory Gallus had eaten french fries within an hour or two before his death. Church admitted in his statement to police that he was at the Gallus residence Saturday night watching television and eating french fries with Gregory Gallus, but that he left and later he returned to the house Sunday or Monday and took the television sets, without noticing the bodies.

Several witnesses testified as to Church's activities on Sunday and Monday, March 26 and 27, 1995. A friend of Church's, Arlan Larson, testified that Church arrived at Larson's house in Spring Lake Park at 9:00 a.m.

Sunday and the two went to a bar in Wisconsin, driving in Gregory Gallus' car. Larson noticed Gregory Gallus' .22 rifle in the backseat of the car and described Church as bearded, unclean, tired and depressed with a "cold and empty and far away" look on his face. After buying some beer in Wisconsin, Larson and Church stopped in a park and had a barbecue. Church returned Larson to his home in Spring Lake Park around 6:00 p.m. Sunday.

Another friend, David Janke, testified that he received a telephone call from Church at about 9:30 p.m. Sunday. Church asked Janke if he wanted to meet for beers, but Janke declined. A bartender at the American Legion in Fridley testified that Church drank alone at the bar Sunday night from 10:30 or 11:00 p.m. until midnight. Church paid for his drinks in quarters, explaining that he had won the money in a poker game the night before.

On Monday, March 27, Church sold the Gallus' three television sets, one to a pawn shop in Anoka, the others at the Fridley Cash and Pawn, the same pawn shop where Church had previously pawned a bin of Gregory Gallus' tools on March 21, 1995. Another friend of Church's, Michael Rudlong, testified that he ran into Church at a bar on Monday around 2:00 or 3:00 p.m. and they played pool there until about 9:00 p.m. Between 10:00 and 10:30 p.m., Church checked into a motel in Cambridge.

On Tuesday, March 28, Church registered and paid for another night at the motel and around 9:00 p.m. that evening, Church ordered a meal from the restaurant across the street. The night delivery driver delivered the meal 10 minutes later. The hotel clerk testified that his shift started at 10:45 p.m., he walked around the motel three times during the night and during his rounds he noticed several police squad cars parked at the restaurant across the street. He testified that the police often gather there for dinner. He did not recall seeing the car Church had registered, Gregory Gallus' Volkswagon, at any time in the lot, but he did notice the door ajar to Church's room and at 6:00 a.m. telephoned the room. When no one answered,

the clerk entered the room, and found it empty and the key was on the table.

Church eluded the police until April 7, 1995. That day, Dale Nei and Larry Mroszak arrived at Nei's lake cabin in Polk County, Wisconsin and noticed liquor bottles and beer missing. Nei followed some footprints in the snow leading away from the cabin and saw a figure down by the lake aiming a shotgun at him. It was Church. Nei said, "You startled me," and Church replied, "Well, you startled me too. I thought you seen me coming from the cabin." Church ordered Nei back into the cabin and told him to cut the phone line. Nei recognized Church as a murder suspect from pictures in the newspaper. After about 2 1/2 hours, Church left the cabin after Nei "got up [his] courage" and said "Well, you kind of wrecked my weekend here. I think I'd like you to leave now." The two men drove to a store about 5 miles away and called 911, after establishing that Church had left the area around the cabin.

A team of deputies from the Polk and Barron County Sheriffs' Departments began a search about 7:00 p.m. on Friday, April 7. Tracking footprints and with the aid of a Minnesota State Patrol helicopter with infrared sensing capability, the search continued until 4:00 a.m. without locating Church, although Gregory Gallus' car was found hidden in the woods under a piece of roofing and old shingles. Inside the car, the police found two shirts later identified as Gregory Gallus', and jewelry and a jar of coins later identified as Delphine Gallus'. A blue flannel shirt found in the car was later determined to have Michael Gallus' blood on it. The search resumed around 6:00 a.m. on Saturday, April 8, and within an hour the police spotted Church near a large pine tree. When a deputy commanded Church to drop his weapon, Church began firing. Many rounds of gunfire were exchanged, and when Church was eventually apprehended, he said "I'm done" or "It's over." Church had sustained an abrasion wound across his abdomen and had been shot in both ankles. The police recovered a 12–gauge shotgun and .22 rifle from the scene. Church was taken first to a local hospital then transferred to St. Paul Ramsey Hospital.

The police tape-recorded Church's statement about the Gallus murders while he was in the hospital. Church denied fighting with Gregory Gallus about his car but admitted that Gregory had been mad when Church had his car the week before the murders. As to the night of the killings, Church said he was drunk Saturday night and did not remember what happened. Church repeatedly replied "I don't know" and "I don't remember" to the officers' questions, but he never denied committing the murders. When the police asked "Is there any doubt in your mind that you did [the murders]?" Church responded, "I'm not sure." When asked what kind of knife he used in "the situation in the house," Church replied "I don't remember." When the police asked why someone would stab three people, Church said, "[m]aybe I'm just mentally insane."

The knife Church used in the murders was not conclusively established, but the middle-sized knife of a set in the Gallus' kitchen was missing. The medical examiner testified that any knife in the set could have been used in the killings. The hunting knife that Church was carrying when the police found him was also consistent with the size and depth of the wounds, but human blood on the knife was not of sufficient quantity for DNA analysis. A kitchen knife found under a sleeper sofa weeks after the murders was also consistent with the victims' wounds.

At trial, Church's defense was that he was at the Gallus residence Saturday night, but drove away around 5:00 p.m. and did not return again until early Monday morning when he entered the house and took the televisions without noticing that the three occupants had been stabbed to death.

After the jury returned its first set of verdicts, the judge reviewed the verdict forms and determined that it was necessary to confer with the attorneys in chambers. For 22 minutes and without objection from defense counsel the jury sat in the courtroom in the presence of the defendant, court personnel, and public spectators. Upon returning to the courtroom, the judge reinstructed the jurors and sent them back to the

jury room with new verdict forms. The judge explained that the jury had returned "inconsistent verdicts"—it appears from the record that the jury found Church guilty of first-degree murder, but not guilty of the lesser included charge of second-degree murder. The jury later returned with its second set of verdicts, convicting Church of two counts of first-degree murder, Minn.Stat. § 609.185(1) (1996), for the deaths of Delphine Gallus and Michael Gallus; one count of second-degree murder, Minn.Stat. § 609.19(1) (1996), for the death of Gregory Gallus; felony theft, Minn.Stat. § 609.52, subd. 2(1) (1996); and theft of a motor vehicle, Minn.Stat. § 609.52, subd. 2(17) (1996).

 We address first Church's claim that the evidence was insufficient to support his convictions. A challenge to the sufficiency of the evidence requires "a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did." *State v. Webb*, 440 N.W.2d 426, 430 (Minn.1989). Circumstantial evidence is "entitled to as much weight as other evidence." *Id.* The evidence should "form a complete chain which, in light of the evidence as a whole, leads so directly to the guilt of the accused as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt." *Id.* (quoting *State v. Anderson*, 379 N.W.2d 70, 75 (Minn.1985) *cert. denied*, 476 U.S. 1141, 106 S.Ct. 2248, 90 L.Ed.2d 694 (1986)).

Here, Church's convictions are supported by a chain of evidence that is clearly sufficient to support his convictions. He was present at the crime scene: the medical examiner estimated the time of death to be between Friday evening, 72 hours prior to the examination of the bodies, and Sunday evening, 24 hours prior to the examination. Church admits he was at the house Saturday night after the last time the victims were seen alive, and came back Sunday or Monday to steal the televisions before the bodies were discovered by the police. The state's theory is that Church killed the Galluses Saturday night and left Sunday with the stolen property; a neighbor saw a bearded man smoking a cigarette outside the Gallus' garage early Sunday morning and the police found the Sunday newspaper inside the house. There was no evidence of a forced entry, indicating that the perpetrator knew the victims, or as in Church's case, lived with the victims. No motive explains an attack by someone else, none of the victims were sexually assaulted and nothing was missing from the home other than the property that Church stole.

Physical evidence ties Church directly to the killings. A boot print consistent with Church's boot was found on the broken gun stock at the foot of the bed where Michael Gallus' body was found. Additionally, when the police searched Gregory Gallus' car in the woods in Wisconsin, they found a shirt with Michael Gallus' blood on it and other personal property taken from the Gallus home.

Church's appearance and behavior in the weeks following the murders also point to his guilt. A friend who was with Church on the day after the murders described him as unclean, tired and depressed with a "cold and empty and far away" look on his face. The following day, after selling property from the Gallus house, Church went to Cambridge, where he paid for two nights, but left in the middle of the second night, perhaps frightened by the presence of several police squads parked at a restaurant across the street from his motel. The following week, when Church was discovered in the woods in Wisconsin, he pointed a shotgun at Dale Nei, ordered him back into the cabin, and made him cut the phone line. Eventually Church left the cabin and hid in the woods until he was apprehended the next day after a shootout with police. "[E]vidence of flight suggests consciousness of guilt." *State v. Bias*, 419 N.W.2d 480, 485 (Minn.1988).

Finally, in his statement to the police Church never denied committing the murders. He generally responded that he did not remember what happened, or what weapon he used, and when asked why he killed the Galluses, said "Maybe I'm just mentally insane."

The jury may reject implausible theories offered by a defendant. *See State v. Landin*, 472 N.W.2d 854, 858–59 (Minn.1991); *State v.*

*Turnipseed,* 297 N.W.2d 308, 313 (Minn. 1980). Here, it was reasonable for the jury to reject Church's theory that he was at the Gallus' home Saturday night, was the last person to see them alive, then he left the house, another perpetrator entered the home without breaking in and stabbed three people to death but did not take anything, then Church returned to the house, did not notice the murdered victims, stole their property and sold it, then fled the state and forced police to shoot him in order to apprehend him.

We conclude that the evidence was sufficient for the jury to find Church guilty of the murders of Delphine Gallus, Michael Gallus, and Gregory Gallus, and to exclude any reasonable inference other than guilt.

■ In addition to his direct appeal, Church filed a petition for postconviction relief seeking a *Schwartz* hearing to determine, pursuant to Minn. R.Crim. Pro. 26.03, subd. 19(6),[1] whether any jury misconduct might have occurred during the 22 minutes when the jury was left in the courtroom while the judge and attorneys conferred in chambers. *See Schwartz v. Minneapolis Suburban Bus Co.,* 258 Minn. 325, 104 N.W.2d 301 (1960). Although *Schwartz* hearings are to be liberally granted, a defendant must establish a prima facie case presenting "sufficient evidence which, standing alone and unchallenged, would warrant the conclusion of jury misconduct." *State v. Larson,* 281 N.W.2d 481, 484 (Minn.1979).

A postconviction hearing was held on February 14, 1997 to give Church the opportunity to present a prima facie case of jury misconduct. Ten people testified about what took place in the courtroom during the 22 minutes, including four attorneys and another employee from the public defender's office, two attorneys from the Anoka County Attorney's office, an in-court deputy, and two court security officers. Various witnesses and the judge estimated that over 100 people were in the courtroom on March 20, 1996 at the time the first set of verdicts were received. The spectators were mostly employees of the offices of the public defender and county attorney, as well as other court personnel. Descriptions of the courtroom during the 22 minutes varied widely, ranging from "a funeral type atmosphere" and "macabre" to "very peculiar," "carnival or circus-like," many people talking and laughing, "fairly loud for a courtroom," "nervous giggles" and "that tense type of laughter." The in-court deputy and two court security officers testified that the courtroom was in control and in general it was "quiet" with "low-key murmuring." One attorney testified that the jury was "restless" and was observed to be speaking in small groups and one juror "got up and moved to another chair." There was no testimony that any contact occurred between the jurors and anyone else in the courtroom or that any conversation was loud enough to be overheard by a juror.

Church presented evidence of one specific incident that he argues could have been seen by the jury. An attorney from the public defender's office testified that an attorney from the county attorney's office made motions and mouthed words to her. She did not understand exactly what he was doing but, in a conversation with the attorney later in the day, she learned that he was making a gesture from Charles Dickens' *A Tale of Two Cities* of a woman in a bar knitting in the names of the people going to the guillotine during the French revolution and mouthing "guillotine." She admitted that in her December 12, 1996 affidavit she made no reference to this incident and explained that she "remembered it afterwards." The assistant county attorney testified that he did not remember making any gesture or mouthing words, particularly in the courtroom, although he "might have been doing something like that in the hallway."

The postconviction court denied Church's request for a *Schwartz* hearing, concluding

---

1. Minnesota Rule of Criminal Procedure 26.03, subd. 19(6), provides:

Affidavits of jurors shall not be received in evidence to impeach their verdict. A defendant who has reason to believe that the verdict is subject to impeachment, shall move the court for a summary hearing. If the motion is granted the jurors shall be interrogated under oath and their testimony recorded. The admissibility of evidence at the hearing shall be governed by Rule 606(b) of the Minnesota Rules of Evidence.

that Church had failed to establish a prima facie case of jury misconduct: "no credible evidence [was] presented to the Court that there was any direct or indirect contact with the jury at any time during their deliberations." The court noted that no evidence demonstrated that the Rules of Decorum[2] for courtroom behavior were violated and the court observed that while Church was sitting closer to the jury box than anyone else in the courtroom, he submitted no evidence of having overheard comments in the courtroom. The credibility of the attorney who described the "carnival" atmosphère and "Tale of Two Cities" incident was questioned by the court because her affidavit was "replete with unsubstantiated conclusions and contain[ed] few specific facts upon which to base her general allegations of an atmosphere of disruptive behavior." After listening to her testimony and observing her demeanor at the hearing, the court "attache[d] little credibility to such a tardy and exaggerated recitation of events." Accordingly, the court denied Church's request that it subpoena the jurors for a *Schwartz* hearing.

The standard of review for denial of a *Schwartz* hearing is abuse of discretion. *Larson*, 281 N.W.2d at 481. Here, the post-conviction court held an evidentiary hearing with oral testimony and cross-examination of nine witnesses to determine if jury misconduct might have occurred during the 22 minutes when the judge and counsel were out of the courtroom, and the court concluded that Church failed to establish a prima facie case. Although many witnesses testified regarding the noise level in the courtroom, the court determined that there had been no contact with the jury during the 22–minute time frame and that other evidence suggesting inappropriate activity was of doubtful credibility. After careful review we find no basis for concluding that the court abused its discretion in denying Church's petition for a *Schwartz* hearing.

In summary, there was sufficient evidence to support Church's convictions for first-degree and second-degree murder and there

was no basis to conclude that the postconviction court abused its discretion in denying Church a *Schwartz* hearing.

Affirmed.

---

2. The court cited a Minnesota Supreme Court order: Order, C4–96–2073, Finance and Commerce 22 (October 18, 1996).