**STATE of Minnesota, Respondent,**

v.

**John Steven MARTIN, Appellant.**

**No. C5–99–1514.**

Supreme Court of Minnesota.

July 20, 2000.

John M. Stuart, State Public Defender and Bryan John Leary, Assistant State Public Defender, for appellant.

Mike Hatch, Attorney General, Thomas R. Ragatz, Assistant Attorney General, and Marvin E. Ketola, Carlton County Attorney, for respondent.

OPINION

GILBERT, Justice.

This case arises from the direct appeal of appellant John Steven Martin's conviction for premeditated first-degree murder, in violation of Minn.Stat. § 609.185(1) (1998), and for aiding and abetting first-degree murder while committing kidnapping, in violation of Minn.Stat. §§ 609.185(3), 609.05 (1998), for the August 28, 1996, murder of Paul Antonich (Antonich).[1] We find no error or abuse of discretion in the trial court's rulings and therefore, we affirm.

Sometime after 8 p.m. on August 28, 1996, 17–year–old Antonich was driving to his parents' home when he rear-ended a vehicle driven by the appellant at the intersection of Sixth Avenue East and Ninth Street in Duluth, Minnesota. With the appellant in his father's vehicle were four of his friends, Lester Greenleaf, Jamie Aubid, John Alexander "Mike" Martin and Andy DeVerney. No noticeable damage was caused to either vehicle. However, witnesses testified that appellant got out of his vehicle and went to the window of Antonich's vehicle. A witness testified that appellant punched Antonich a couple of times. Appellant claimed that the accident frightened him because he had no valid driver's license and no proof of insurance. At that point, some or all of appellant's friends got out of the vehicle and approached Antonich's vehicle, swearing and yelling at Antonich. Witnesses testified that the men were angry and aggressive and two of the men also punched Antonich through the window.

A witness testified that following this initial assault, Antonich moved over to the passenger side of his vehicle. Mike Mar-

---

1. *See also State v. Martin,* 591 N.W.2d 481 (Minn.1999) (appellant's pretrial appeal).

tin[2] (Martin) testified that Greenleaf then got into the driver's seat and removed the vehicle from the intersection. Appellant, Aubid, DeVerney and Martin were in appellant's vehicle. Both vehicles then left the scene of the accident and proceeded to the intersection of 15th or 16th Street West and 3rd Street where the men exited the vehicles and struck and kicked Antonich. Appellant, Aubid and Martin then returned to the vehicle in which they had arrived at this scene. Greenleaf, DeVerney and Antonich left the scene in Antonich's car. Martin said he heard appellant then say, "I think we killed the f———," and said he wanted to get rid of the body. The two vehicles drove south on Highway 35, with appellant leading the way.

Martin then testified that both vehicles proceeded for approximately 34 miles to Ditchbank Road in a remote area on the Fond du Lac reservation outside Cloquet in Carlton County. Appellant exited his vehicle. Martin testified that appellant then said he was going to shoot Antonich. Martin said he saw appellant point a gun at Antonich's head and heard a shot, followed shortly thereafter by three more shots. He said the first gunshot wound was to the neck. The medical examiner who performed the autopsy of Antonich testified that the gunshot wound to the neck would not necessarily have killed Antonich. The medical examiner concluded however, that Antonich's death was a homicide and the cause of death was gunshot wounds, primarily one to the lower chest and also a fatal shot to the head. The medical examiner also testified that Antonich had a fourth gunshot wound below the jaw and that extensive bruising, abrasions and lacerations indicated that the shooting took place after Antonich had suffered a severe beating.

After killing Antonich, according to Martin, the men attempted to conceal the crime. Greenleaf, DeVerney and Martin wiped down Antonich's vehicle. Police officers testified that Antonich's body was found in the trunk of his vehicle, but neither appellant nor Martin testified as to who had placed it there. Appellant then drove Antonich's vehicle off the road into a drainage ditch. He exited the vehicle through the driver's window onto the roof, walked across the roof onto the trunk, and then jumped from the trunk onto the bank. Martin testified that appellant told the men to keep silent about the murder as they rode back to Duluth.

The morning after the murder all five men got together, drove to the Blatnik Bridge in Duluth, and Martin threw the gun used to kill Antonich into Lake Superior. That day, Martin told Lawrence Murray, a friend, about the murder the night before. Around noon that day, a logger discovered Antonich's vehicle in the drainage ditch submerged up to the bottom part of the dashboard and alerted the authorities. Police officers had Antonich's vehicle towed out of the ditch and discovered his body in the trunk. The police found shoeprints on the roof, rear window and trunk of the vehicle and on a cooler found inside the vehicle. The Bureau of Criminal Apprehension laboratory later determined that the prints on the trunk and cooler corresponded in general tread pattern to the type of shoes appellant was wearing on the day of the murder but not to the general tread patterns of Antonich's, DeVerney's or Greenleaf's shoes. The evening after the murder, Murray,

---

2. After a then-anonymous tip led police to Martin, he was interviewed and implicated the other four defendants. Martin later reached a plea agreement with authorities wherein he would plead guilty to aiding and abetting second-degree murder and testify against the other four accomplices. The plea agreement allowed the court to reduce Martin's sentence 25 to 50 percent for testifying truthfully. Martin provided many of the details of Antonich's murder in his statement to police and during the trial of appellant and the other co-defendants. See also State v. DeVerney, 592 N.W.2d 837, 839–41 (Minn. 1999); State v. Greenleaf, 591 N.W.2d 488, 494–96 (Minn.1999); State v. Aubid, 591 N.W.2d 472, 475–77 (Minn.1999).

watching the news, learned of the death of Antonich. He then placed two anonymous calls to law enforcement agencies, one to Carlton County and one to St. Louis County. Officer Kepler took the call to St. Louis County, and Murray told him what Martin had said earlier in the day about the murder. The following day, August 30, 1996, police officers arrested Martin. On August 31, 1996, Martin admitted his involvement in Antonich's murder and implicated the other four co-defendants.

Appellant's cousin, Kevin LaDue, testified that appellant left Duluth on August 31, 1996, after appellant asked him for a ride. Appellant brought with him in the vehicle a duffel bag of clothes, a cooler of beer and a knife. At some point in the drive, appellant told LaDue to drop him off on the North Shore of Lake Superior and appellant took with him only the knife and the beer. Appellant cut his wrists in a suicide attempt because he claimed he was being blamed for something he did not do. Later in the evening, he spoke with the mother of his children on the phone and arranged a meeting at the Blue Bird Landing on the North Shore. She testified that when she arrived, appellant was distraught and crying. She noticed a cut on his wrist. She later talked to the police and said that appellant reported that he was not involved in the murder, he was just driving his father's vehicle when it happened. She said he was afraid to go to jail. An extensive manhunt for appellant began in the early morning of September 1, 1996. Appellant was apprehended at approximately ten that evening. A police officer testified that he had cuts on his hands and wrist, which were not new.

After bringing appellant to St. Luke's Hospital to tend to his injuries, the officers brought him to Duluth police headquarters where he was interviewed for about 2½ hours with two breaks. One of the examining officers testified that appellant initially denied any involvement in the accident or the crime or claimed that he did not remember or know any specifics.

Eventually, appellant responded affirmatively to police officer questioning regarding his involvement. He said that he first shot Antonich in the neck and that after the shot Antonich was "gurgling." He then agreed that he had shot him a total of four times. After the body was placed in the trunk, he said that he drove the vehicle into the drainage ditch. Appellant agreed that his fingerprints might be in Antonich's vehicle because he had touched it at the accident scene. He also agreed that his fingerprints might be on the gun. Asked if there was any reason that his shoeprints would be on the trunk of Antonich's vehicle, appellant eventually said he had crawled out of the window of the vehicle, onto the roof and across the trunk after he drove the vehicle into the ditch. Appellant also admitted going with his accomplices to the Blatnik Bridge on August 29, 1996, where someone threw the gun used to kill Antonich into the water.

Several days later, on separate occasions, some of the accomplices and the appellant showed the police where the gun was thrown into Lake Superior under the Blatnik Bridge. Police found the murder weapon after searching for 3 to 4 days.

At trial, appellant testified that he was drinking excessively before and during a party on the day of the murder. He drank at least eight beers and half of a pint of Southern Comfort. He testified that he had given the keys to his father's vehicle to DeVerney at the party, got into the car, blacked out and the next thing he remembered was waking up the day after the murder. He said that Martin then told him what had happened the night before and that Martin said that he had shot Antonich in the neck and killed him. He admitted that after that discussion, he had accompanied the others to Blatnik Bridge. On the stand, he denied that during his police interview he admitted killing Antonich. He admitted that he told the mother of his children that he was driving his father's vehicle when Antonich was murdered. He admitted that he did not tell

the police about his correct whereabouts on the day of the murder because he had his days "mixed up." Appellant testified that he did not kill Antonich and that he did not know who had killed him.

Appellant testified that he could not remember some of what he told police in his interview because he did not feel well at the time of the interview. He claimed that he was just telling them during the interview what Martin had told him, including that Martin had told him he was the shooter. Appellant argued that because he could not remember what had happened during the murder, he did not volunteer information to police. He only agreed that it was possible that what they were telling him was true because he had no way of knowing whether it was or was not true. He tried to show that his answers were really questions or simply repeating what the police had said.

In rebuttal testimony, Martin denied telling appellant details that appellant relayed to the police: that appellant drove the vehicle or that appellant had shot Antonich in the neck. A former Duluth resident contradicted appellant's testimony that he was passed out on the evening of the murder. The former resident testified that he saw and talked with appellant on the night of the murder at a party and that appellant had been involved in an argument.

On September 17, 1996, a Carlton County grand jury returned an indictment charging appellant with premeditated first-degree murder in violation of Minn.Stat. § 609.185(1) and with first-degree murder, intentional killing during a kidnapping, in violation of Minn.Stat. § 609.185(3). The second count of the indictment was amended on May 10, 1999, to include Minn.Stat. § 609.05, subds. 1, 2 (1998), for aiding and abetting the intentional killing during a kidnapping. The trial court granted appellant's motion for a change of venue and the trial was held in Dakota County. During voir dire, over appellant's objection, the prosecutor exercised a peremptory strike to discharge the only minority juror, an African American.

During the trial, the trial court granted the state's motion to exclude the proffered testimony of Kepler, appellant's witness, regarding the anonymous phone call he received from Murray. The jury, after being out for almost nine hours, found appellant guilty of both charges and he was sentenced to the mandatory term at that time of imprisonment for life. After the trial, appellant filed, inter alia, a motion for a *Schwartz* hearing, which the trial court denied after discussion on the motion at the sentencing hearing.

Appellant challenges his conviction on the following grounds: (1) that the state improperly used its peremptory challenges to remove an African–American juror from the jury panel; (2) that the trial court abused its discretion by excluding Kepler's testimony; and (3) that the trial court abused its discretion by denying a *Schwartz* hearing.

I.

Appellant first contends that the state improperly used a peremptory challenge to strike the only African American from the jury pool. Using peremptory challenges to exclude persons from the jury solely on the basis of race is prohibited by the Equal Protection Clause of the United States Constitution. *See Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *see also* U.S. Const. amend. VI; Minn. Const. art. 1 §§ 2, 6. To make a successful *Batson* challenge, a defendant must make a prima facie showing that the state exercised a peremptory challenge on the basis of race; the burden then shifts to the state to articulate a race-neutral explanation for striking the juror in question; then, the trial court must determine whether the defendant met his burden of proving intentional discrimination. *See Flournoy v. State*, 583 N.W.2d 564, 570 (Minn.1998); *see also Hernandez v. New York*, 500 U.S. 352, 358–59, 111

S.Ct. 1859, 114 L.Ed.2d 395 (1991). We will not reverse the trial court's determination to sustain a peremptory challenge "absent clear proof that the prosecution's stated reason for making the peremptory challenge was pretextual." *DeVerney,* 592 N.W.2d at 843.

■ Where the trial court decided the ultimate question of intentional discrimination, the question whether the defendant made a prima facie showing is moot. *See State v. Scott,* 493 N.W.2d 546, 548 (Minn. 1992) (citing *Hernandez,* 500 U.S. at 359, 111 S.Ct. 1859).

■ The next question is whether the prosecutor articulated a race-neutral explanation for striking the juror in question. *See DeVerney,* 592 N.W.2d at 843 (citing *Batson,* 476 U.S. at 97, 106 S.Ct. 1712). The prosecutor's explanation "does not have to be 'valid' in the sense of establishing a reasonable basis for challenge, but it must be race-neutral." *Id.* We do not require a "persuasive, or even plausible" explanation. *Id.* (quoting *Purkett v. Elem,* 514 U.S. 765, 767–68, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995)). "At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent was inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* (quoting *Hernandez,* 500 U.S. at 358–59, 111 S.Ct. 1859).

The prosecutor gave a three-part explanation for his strike. First, the juror's father had apparently been convicted of felony murder or robbery during the commission of which the juror believed someone had been killed. The juror's father was imprisoned during the juror's formative years and there was going to be testimony in this case about appellant's two young children. The prosecutor stated that the appellant's case was "almost identical." Second, the prosecutor felt that the juror's expressed anxiety about losing his job would cause the juror to be preoccupied and unable to focus on the task of being a juror. Finally, the juror's brother was in prison, initially for a charge of criminal sexual conduct, and now for a parole violation.

■ This list of reasons provided sufficient nonrace-based justifications for the peremptory strike. A family member's involvement with a criminal investigation is a race-neutral reason for striking a juror. *See Scott,* 493 N.W.2d at 549 (holding that a juror's recent involvement with the sheriff's office because her husband used a gun to threaten to kill her stepson was a racially neutral explanation). Further, a confessed preoccupation and anxiety about finances and losing one's job is also a race-neutral reason. *See Batson,* 476 U.S. at 89, 106 S.Ct. 1712 (holding that a prosecutor may exercise a peremptory challenge "for any reason at all, as long as that reason is related to his view concerning the outcome of the case to be tried") (quotation omitted).

■ After the prosecutor has given a facially valid, race-neutral explanation, the trial court considers all of the relevant evidence bearing on the issue and determines whether the defendant has proven that the prosecutor acted with discriminatory intent. *See DeVerney,* 592 N.W.2d at 844 (citing *Hernandez,* 500 U.S. at 362–66, 111 S.Ct. 1859). The defendant has the burden to prove purposeful discrimination, and we review the trial court's finding about the prosecutor's intent for clear error. *See Greenleaf,* 591 N.W.2d at 501. "[C]onsiderable deference must be given by a reviewing court to the trial court's finding on the issue of intent because the finding typically will turn largely on an evaluation by the trial court of credibility." *DeVerney,* 592 N.W.2d at 844. If the prosecutor had a discriminatory intent, the defendant is automatically entitled to a new trial because the harmless error analysis is "inappropriate in the case of a defendant convicted by a petit jury if there was racial discrimination in the selection of that jury." *Greenleaf,* 591 N.W.2d at 500–

01 (quoting *State v. McRae,* 494 N.W.2d 252, 260 (Minn.1992)).

Appellant argues that the prosecutor's reasons are pretextual because once the juror was assured by his employer that he would not lose his job as a result of absences due to jury duty, he stated that he could manage and would not let his finances interfere with being a juror. During voir dire, the juror expressed concern about his finances, losing his job, and his ability to concentrate because of these worries. He equivocated about his ability to be as fair as possible and to give the matter his full attention if he was required to serve. The trial court found that appellant had not shown the reasons given were a "pretextual explanation offered to mask a discriminatory intent," because the court also "observ[ed] some hesitancy" in the juror. Given the trial court's observation of the juror and the prosecutor and the considerable deference given to the trial court's credibility determinations, we hold that the trial court properly determined that appellant had failed to demonstrate that the prosecutor acted with discriminatory intent when he struck the juror for this reason.

■■■■■ Appellant also argues that excluding African Americans who have family members with criminal histories from juries would have a disparate impact on African–American participation in juries because African Americans are more frequently arrested and more often have criminal records because of the scrutiny they face from the predominantly white police force. "If the basis for the challenge given by the prosecutor is one that will result in the disproportionate exclusion of members of a certain race or gender, the trial court may consider this as *one of the relevant circumstances* bearing on the determination of whether the facially-valid reason given by the prosecutor is a pretextual explanation offered to mask a discriminatory intent." *Greenleaf,* 591 N.W.2d at 500 (emphasis added). A disparate impact alone will not violate the prin-

ciple of race neutrality, "[u]nless the [prosecutor] adopted a criterion with the intent of causing the impact asserted." *Hernandez,* 500 U.S. at 362, 111 S.Ct. 1859. The trial court did not find a masked discriminatory intent to adopt a criterion that would exclude minorities. Looking to the entire record and with deference to the trial court's determination of the prosecutor's credibility, we hold that the finding that the prosecutor acted without discriminatory intent was not clearly erroneous.

## II.

■■■■ Appellant's next contention is that the trial court erred when it excluded the proffered testimony of the appellant's witness, Officer Kepler. Appellant made an offer of proof that Kepler would testify that Murray, a prosecution witness, had told him during a phone call that Martin, a co-defendant and also a prosecution witness, had told Murray just after the murder that "he and Jamie Aubid [also a co-defendant] killed a white man." The state objected to the testimony of Kepler on the grounds that it was "at least double hearsay." The trial court excluded the testimony. Trial court decisions on the admission of evidence are reviewed for a clear abuse of discretion. *See State v. Williams,* 586 N.W.2d 123, 126 (Minn.1998). Because Kepler's testimony involved hearsay within hearsay, it is only admissible if each statement conforms with an exception to the hearsay rules. *See* Minn. R. Evid. 805.

■■■■ At trial, appellant presented two arguments to support admission of the out-of-court statements. Appellant argued that Martin's statement to Murray was admissible as a statement against interest and Murray's statement to Kepler was admissible as an excited utterance. Under Minn. R. Evid. 803(2), an "excited utterance," is admissible if it "relat[es] to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." There are "no strict temporal guidelines for admitting an excited utterance." *State*

*v. Bauer*, 598 N.W.2d 352, 366 (Minn.1999). However, the statement must be made while the declarant is "under the stress of excitement" from the startling event. Minn. R. Evid. 803(2). The trial court, in its discretion, determines whether the declarant was under the "aura of excitement," Minn. R. Evid. 803(2), Advisory Comm. Cmt.—1989, and we review the determination for an abuse of discretion, *State v. Edwards*, 485 N.W.2d 911, 914 (Minn.1992).

The state argued that Murray's statement to Kepler was not made "contemporaneous[ly]" with the startling event, here, Martin's admission. According to Murray, Martin's admission was made at about 6 or 7 p.m. Murray's "utterance" to police was made a few hours later after Murray saw a story about the death of Antonich on the evening news. Appellant argued that Murray was excited and spoke to Kepler "within an hour or two" of hearing Murray's confession. The trial court found that the exception did not apply to the statement made "many hours after" the startling event. Without evidence of Murray's excitement, other than that which the appellant argues we can infer from the timing alone, we hold that the trial court's exclusion of this portion of the hearsay statement was not an abuse of discretion. *Cf. Bauer*, 598 N.W.2d at 367 (holding that statements about a startling event were admissible where there was testimony that the declarant was "very upset," "extremely agitated," and "very afraid"); *State v. Berrisford*, 361 N.W.2d 846, 850 (Minn.1985) (holding that statements made 90 minutes after startling event were excited utterances where there was testimony that declarant was "very upset," "scared," and "shaky").

■■■ Additionally, the trial court did not abuse its discretion in rejecting appellant's argument that Martin's statement to Murray was admissible as a statement against interest. That exception does not apply here because Martin testified at trial and the exception only applies if the de-clarant is unavailable. *See* Minn. R. Evid. 804(b)(3).

■■■ On appeal, appellant offers new arguments in support of admission not presented to the trial court. Appellant argues that this testimony is admissible as extrinsic evidence of a prior inconsistent statement under Minn. R. Evid. 613(b) for impeachment purposes only. *See generally State v. Thames*, 599 N.W.2d 122, 125 (Minn.1999); Minn. R. Evid. 607 and 613. In order to impeach a witness with prior inconsistent statements, appellant must submit a foundation that the statements are "actually inconsistent," *State v. Vance*, 254 N.W.2d 353, 358 (Minn.1977), or that the declarant "fails to recollect" the prior statement, *Wild v. Rarig*, 302 Minn. 419, 458, 234 N.W.2d 775, 799 (1975). The witness must be given a prior opportunity to admit, deny or explain the inconsistency in order for the statement to be admissible to impeach the witness. *See State v. Richards*, 495 N.W.2d 187, 194 (Minn.1992); Minn. R. Evid. 613(b). The state argues that a proper foundation was not laid for the admission of the prior inconsistent statement because Murray was given no such opportunity.

■■ On direct examination, appellant's attorney asked Murray about the contents of Martin's statement. Murray answered that Martin had never personally identified himself as the shooter. Instead, Murray testified that "[Martin's] words were they." He also testified that he relayed the contents of this conversation to Kepler. On cross, Murray was directly challenged about his assertion that he told Kepler that Martin said "they" had killed somebody. Murray answered that he could not recall exactly what he had said. Failing to recall the prior statement was sufficient foundation to impeach the witness using extrinsic evidence. *See Rarig*, 302 Minn. at 458, 234 N.W.2d at 799 (failing to recollect statement is sufficient foundation for impeachment).

However, rather than impeaching Murray with Kepler's testimony, appellant confronted Murray with other extrinsic evidence of the prior inconsistent statement, Murray's testimony given under oath during DeVerney's trial for Antonich's murder. Murray agreed that his testimony during DeVerney's trial was that he had told Kepler that Martin said "he" had killed somebody. Murray testified that his memory was fresher at the DeVerney trial.

■ The trial court did admit extrinsic evidence of Murray's phone call to Kepler to impeach Murray in the form of Murray's testimony at DeVerney's trial. Appellant used this evidence in both his opening and closing statements when he mentioned Murray's phone calls to Kepler. The trial court retains the discretion to refuse to admit additional impeachment evidence as prejudicial or cumulative. *See* Minn. R. Evid. 403. We hold therefore, there was no abuse of discretion to refuse to allow Kepler to testify because that evidence would have been cumulative.

■ Appellant also argues that Kepler's proffered testimony was admissible as a prior consistent statement. *See* Minn. R. Evid. 801(d)(1)(B). Prior consistent statements are admissible as substantive evidence if the declarant testifies at trial and is subject to cross-examination and if the statements are helpful to the trier of fact. *See id; see also State v. Nunn*, 561 N.W.2d 902, 908 (Minn.1997). Murray testified on direct examination ("they" killed somebody) inconsistently with his alleged out-of-court statement ("he" killed somebody). It was appellant who attacked Murray's credibility by offering the former inconsistent statement ("he"). Once Murray agreed that he had made the prior statement, Kepler's testimony was nothing more than a confirmation that Martin had indeed used the word "he." The trial court retained the discretion to exclude such testimony as not helpful to the trier of fact under Rule 801(d)(1)(B) or cumulative under Rule 403 and thus did not abuse its discretion.

■ The next level of hearsay is Martin's purported statement/admission to Murray the day after the killing that he had killed somebody. Appellant argues that Kepler's testimony about this portion of the double hearsay should be admissible under the residual hearsay exception because it was the only means to clarify what Murray heard Martin say because Murray's memory had faded and because Kepler had no reason to falsify the statement. The residual hearsay exception allows for the admissibility of hearsay statements when, though they are not admissible under any other exception, the statements have "equivalent circumstantial guarantees of trustworthiness." Minn. R. Evid. 803(24). We agree with the state that there was no abuse of discretion in failing to admit the statement under this broad exception. Appellant failed to establish sufficient guarantees of trustworthiness because he made no offer of proof about the circumstances of the conversations, Kepler's memory, or his relationship, if any, to Murray. *See, e.g., Aubid*, 591 N.W.2d at 479–80 (discussing factors that bear on determining trustworthiness).

Before appellant offered Kepler's testimony, the appellant had already introduced extrinsic evidence to contradict Murray's testimony. Appellant used this evidence in both his opening and closing statements. Therefore, we hold that the trial court did not abuse its discretion in excluding the testimony of Kepler.

## III.

■ Appellant's final contention is that the trial court erred in failing to order a *Schwartz* evidentiary hearing to investigate his claim of juror misconduct. *See generally Schwartz v. Minneapolis Suburban Bus Co.*, 258 Minn. 325, 328, 104 N.W.2d 301, 303 (1960). In order to be entitled to a *Schwartz* hearing, a "defendant must establish a prima facie case presenting 'sufficient evidence which, standing alone and unchallenged, would

**226**

warrant the conclusion of jury misconduct.'" *State v. Church*, 577 N.W.2d 715, 720 (Minn.1998) (quoting *State v. Larson*, 281 N.W.2d 481, 484 (Minn.1979)). We review the trial court's denial of a *Schwartz* hearing for abuse of discretion. *See Church*, 577 N.W.2d at 721.

If a defendant has reason to believe that the jurors' verdict is subject to impeachment, he must move for a summary hearing, in which the trial court decides whether to order a *Schwartz* hearing. *See* Minn. R.Crim. P. 26.03, subd. 19(6). If the motion is granted, the trial court conducts a postverdict hearing, a *Schwartz* hearing, in which jurors are examined under oath as a means of addressing concerns of juror misconduct. *See id.* During a *Schwartz* hearing, interrogation of jurors is limited by Minn. R. Evid. 606(b), which generally disallows testimony about the jurors' thought processes or deliberations to impeach a verdict. Juror testimony regarding improper contact between one or more jurors and some third party or the influence of extraneous prejudicial information is allowed. *See* Minn. R. Evid. 606(b).

■ During the summary post-trial hearing on June 3, 1999, appellant argued that there had been jury misconduct when

[A]fter the verdict was reached but before it was read, some of the jurors expressed a desire to speak to the Antonich family and that indicates to me that there was—sympathy took [the] place of evidence in this case, and that there's a question as to who is speaking to the jury, how did they find out that the Antonich family was there, who told them, when did they tell them, and what else were they told.

Appellant makes two allegations of misconduct. First, the jury "may have received information during the trial that they shouldn't have received," in particular, information that allowed them to know the Antonich family was present. The court asked appellant if he had any "specific" evidence that the jurors had improperly received information. Appellant respond

ed "no." The court denied the *Schwartz* hearing on this basis because appellant had failed to make a prima facie showing of misconduct. Appellant is not entitled to a *Schwartz* hearing on the basis of "wholly speculative" allegations of misconduct without more. *See State v. Mings*, 289 N.W.2d 497, 498 (Minn.1980) (finding no abuse of discretion in denying a *Schwartz* hearing where a claim that some third party contacted one or more jurors and improperly influenced the jury verdict was "wholly speculative" and not based on evidence reasonably suggesting misconduct). Under the circumstances, we hold that the trial court did not abuse its discretion in failing to order a *Schwartz* hearing on this basis.

■ The second allegation of misconduct was that "sympathy controlled [the jury's] decision, not the evidence." The trial court denied a *Schwartz* hearing based on this allegation because it would require the "jurors to testify as to matters that might have occurred during the course of their deliberations that led them to reach the verdict that they did and, of course, that would be off limits." The trial court's reasoning is in accord with the rules of evidence, which forbid testimony about the thought processes in determining guilt. *See* Minn. R. Evid. 606(b); *see also State v. Hoskins*, 292 Minn. 111, 125, 193 N.W.2d 802, 812 (Minn.1972). The trial court found that none of the exceptions for testifying about the motivation behind the verdict applied.

Additionally, the jurors were instructed that "in arriving at your verdict, you shall not permit bias, prejudice, or sympathy to affect your judgment. You should base your verdict entirely upon the evidence which has been received in court and upon the law which I have given you in these instructions." In response, appellant points to a May 28, 1999, newspaper article, which quoted the jury foreperson as saying that the jurors' minds were made up almost immediately. However, such a

statement, without more, does not provide any evidence of improper influence or bias. We presume that jurors follow the trial court's instructions. *See State v. Shoen,* 578 N.W.2d 708, 718 (Minn.1998). Appellant articulated no specific facts to overcome this presumption. Inquiry into the motivation for the verdict would entail asking questions in violation of Rule 606(b). Therefore, we hold that the trial court did not abuse its discretion in failing to order a *Schwartz* hearing on this basis.

Affirmed.